SCHNUCK MARKETS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SCHNUCK MARKETS, INC., Respondent.

Nos. 91–2627, 91–2653.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 8, 1992.

Decided April 7, 1992.

Dennis G. Collins, St. Louis, Mo., argued (Craig J. Hoefer, on brief), for petitioner.

Marilyn O'Rourke, Washington, D.C., argued (Howard E. Perlstein, Jerry M. Hunter, D. Randall Frye and Aileen A. Armostrong, on brief), for respondent.

Before BOWMAN, MAGILL and LOKEN, Circuit Judges.

MAGILL, Circuit Judge.

Schnuck Markets, Inc., appeals the National Labor Relations Board's determination that the company violated the National Labor Relations Act by demoting Thomas H. Jennings for protected union activity. The Board adopted an administrative law

judge's finding that Jennings was not a statutory supervisor and, therefore, the company's demotion of him for union activity violated the Act. Schnucks also appeals the determination that the company violated the Act by refusing to assign Jennings to Sunday manager-on-duty work because of his union activity.[1] We reverse.

I.

Schnucks operates a chain of grocery stores in the St. Louis metropolitan area. On March 7, 1988, Schnucks named Jennings, a then twenty-year employee, night manager of Schnucks' Ballwin, Missouri, store, one of the company's largest. As night manager, Jennings was the only manager on duty between the hours of 10 p.m. to 6 a.m. He was responsible at night for the overall management of the store which carried an average daily inventory of $2 million to $3 million. He also oversaw the work of twelve to sixteen employees, including checkers, baggers, cashiers, floor crew, a video clerk, delicatessen workers, and bakery workers. In addition, Jennings spent about thirty to forty percent of his time doing manual labor—stocking cigarettes and beer, and straightening the liquor.

Jennings belonged to the United Food and Commercial Workers Union, which represented all store employees except meat cutters and deli and seafood workers. The collective bargaining agreement between the union and Schnucks excluded store managers from membership in the union and provided that no supervisor or manager could perform "stocking, price marking, truck unloading or building displays, or any other bargaining unit work on a regular basis."[2]

In December 1989, the company posted a work schedule that removed Jennings from Sunday duty effective December 17. Jennings complained to store manager Nick Collida about the change because Sunday duty entitled Jennings to premium pay of about $40 per week. Collida responded

1. The Board filed a cross-application for enforcement of its order.

2. CBA Articles 1.1 and 1.3, J.A. at 250.

that Jennings earned too much money as night manager to work Sundays at premium pay. When Jennings responded that the collective bargaining agreement granted him the right to work Sunday hours, Collida asked Jennings if he wanted to remain night manager. Jennings said he would not voluntarily give up the night manager position. Collida refused to change the schedule.

Jennings, on December 18, filed a grievance over the loss of pay from the schedule change. At a hearing to discuss the grievance, Maureen Tedoni, labor relations specialist for Schnucks, offered to give Jennings four hours' pay for December 17. Tedoni also told Jennings that a decision had been made to replace him as night manager. Tom Evett, district manager for the company, said the company decided to remove Jennings from the night manager position to avoid a grievance every week Jennings was not scheduled to work Sunday. The company, on January 15, 1990, demoted Jennings from night manager to full-time produce clerk. Three days later, the union filed a grievance on Jennings' behalf over the demotion.

On February 11, the store assigned Vicki Vogt, an employee with less seniority than Jennings, as a Sunday manager on duty.[3] Later, the company also assigned grocery clerk Rick Russell as a Sunday manager on duty. Jennings filed grievances on February 15, 19, and 26 to protest the loss of premium hours he would have earned had he been scheduled to work Sundays. At a

grievance meeting, Tedoni denied Jennings' February 15 grievance. Tedoni said that since Jennings was no longer part of management, he was not qualified to work as a manager on duty.

The Board's regional director filed a complaint on Jennings' behalf. After a hearing, the administrative law judge found that Schnucks violated § 8(a)(1) and (3)[4] of the Act by threatening Jennings with demotion, demoting him, and refusing to assign him as Sunday manager, all because of his protected union activity.[5] The Board adopted the ALJ's decision and order.

## II.

Two issues are present on appeal: (1) whether Schnucks violated the Act by demoting Jennings from night manager for union activity; and (2) whether Schnucks violated the Act by refusing to assign Jennings to Sunday manager-on-duty shifts after the demotion. Because we find that the Board lacked jurisdiction to hear Jennings' demotion claim, and because we find that there is not substantial evidence to support the Board's determination that the company refused to assign Jennings to Sunday duty as a result of his union activity, we reverse.

### A. Demotion from Night Manager

Schnucks concedes it demoted Jennings from night manager to produce clerk because he threatened to file grievances every week he was not given Sunday

---

**3.** The collective bargaining agreement requires scheduled overtime to be offered to qualified employees on the basis of seniority. CBA Article 7.1(e), J.A. at 253. While Sunday workers receive premium pay, Sunday work does not necessarily constitute overtime.

**4.** The statutes provide that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of guaranteed rights, 29 U.S.C. § 158(a)(1) (1988), or by discriminating in terms of employment in order to encourage or discourage membership in a labor organization. 29 U.S.C. § 158(a)(3) (1988).

**5.** The ALJ also found that Schnucks violated § 8(a)(1) of the Act by disparately enforcing its policy on the posting of notices and by directing employees to remove union meeting literature.

The ALJ found that Schnucks violated § 8(a)(1) of the Act by implying to Jennings he could no longer have every Saturday off because of his grievance filing and other union activity. Schnucks failed to appeal these two Board determinations. Since these portions of the order were not appealed, they will be summarily enforced. 29 U.S.C. § 160(e) (1988); *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665, 102 S.Ct. 2071, 2082, 72 L.Ed.2d 398 (1982); *Hall v. NLRB,* 941 F.2d 684, 687 (8th Cir.1991). The Board's determination that Schnucks violated § 8(a)(1) of the Act by threatening Jennings with reprisals for discussing union business with employee Nathan Jones is reversed because the incident occurred while Jennings was a supervisor.

hours. The company contends, however, the Act does not protect Jennings because he was a supervisor. The National Labor Relations Act[6] excludes supervisors from the scope of its coverage.[7] The finding of supervisory status, therefore, is dispositive of the demotion question because, if Jennings is found to be a supervisor, he is unprotected by the Act and may be demoted or fired for union activity. *Parker–Robb Chevrolet, Inc.*, 262 N.L.R.B. 402 (1982), *petition for review denied sub nom. Automobile Salesmen's Union v. NLRB*, 711 F.2d 383 (D.C.Cir.1983); *Roma Baking Co.*, 263 N.L.R.B. 24 (1982); *Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 918 (3d Cir.1981). Schnucks bears the burden of proving supervisory status. *Hearnsberger v. Gillespie*, 435 F.2d 926, 929 (8th Cir.1970).

In determining supervisory status under the Act, the statutory definition rather than the ordinary, common-sense definition of the word controls. Section 2(11) of the Act provides:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (1988). This statutory definition has two components. First, the individual must have the authority to accomplish one of the enumerated functions. This requirement is read in the disjunctive. Therefore, an individual's ability to exer-

cise any one of the listed powers justifies the finding of supervisory status. *NLRB v. Chem Fab Corp.*, 691 F.2d 1252, 1256 (8th Cir.1982). Second, the exercise of the individual's authority must require the use of independent judgment and be of more than a routine or clerical nature. Therefore, so-called "straw bosses" are not necessarily supervisors even if they give minor orders or supervise the work of others. *Phillips v. Kennedy*, 542 F.2d 52, 56 (8th Cir.1976).

The Board concluded Jennings was not a supervisor because he exercised independent judgment only sporadically. The Board found that the store manager retained all significant authority and gave Jennings no authority beyond that of a routine nature. For instance, the Board concluded that Jennings did not participate in managerial meetings, that his supervision mainly consisted of implementing the orders of daytime managers, and that he spent thirty to forty percent of his time on manual duties. Finally, the Board found that the company treated Jennings as a non-supervisor in all other respects under the bargaining agreement, and that although he was called a "manager," several employees had that title but were not considered supervisors.

Whether an employee is a supervisor is a factual question that falls within the Board's special expertise of applying the statutory framework to the "infinite gradations of authority within a particular industry." *Chem Fab*, 691 F.2d at 1256. Therefore, the Board's determination warrants deference so long as it is supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 463,

---

**6.** 29 U.S.C. §§ 141–187 (1988).

**7.** The supervisor exclusion was added by the Taft–Hartley amendments. Labor Management Relations Act, 1947, ch. 120, tit. I, § 101, 61 Stat. 136 (1947) (codified at 29 U.S.C. §§ 141–187 (1988)). While the stated purpose of the Wagner Act, ch. 372, § 1, 49 Stat. 449 (1935), was intended to promote unionization, the Taft–Hartley Act attempted to restore some balance to labor management relations. *NLRB v. Res-Care, Inc.*, 705 F.2d 1461, 1465 (7th Cir.1983).

The exclusion of supervisors from protection under the Act helps meet this purpose by enabling employers to use supervisors in the event of a strike. More importantly, it prevents the loss of control of the company's work force to supervisors whose mixed loyalty to the company they represent and the union to which they belong might cause them to become controlled by the union whose members they are supposed to supervise. *Id.* at 1465–66.

95 L.Ed. 456 (1951). Meeting the substantial evidence standard, however, requires more than a parsing of the record for evidence supporting the Board's decision. We also must consider evidence in the record that fairly detracts from the weight of the decision. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464.

This scrutiny is particularly appropriate in cases where the Board determines supervisory status. One commentator and numerous courts have assailed the Board's inconsistent determinations in this regard, complaining that the pattern of the Board's decisions on supervisory status "displays an institutional or policy bias on the part of the Board's employees" to expand the scope of the Act's protection. Note, *The NLRB and Supervisory Status: An Explanation of Inconsistent Results*, 94 Harv.L.Rev. 1713, 1714 (1981).

> The Board applies the definition of supervisor that most widens the coverage of the Act, the definition that maximizes both the number of unfair labor practice findings it makes and the number of unions it certifies.

*Id.* at 1721; *see also Waverly–Cedar Falls Health Care Center v. NLRB*, 933 F.2d 626, 631 (8th Cir.1991) (Loken, J., concurring); *Children's Habilitation Center, Inc. v. NLRB*, 887 F.2d 130, 132 (7th Cir. 1989) ("More important than verbal niceties in the standard of review is judicial impatience with the Board's well-attested manipulativeness in the interpretation of the statutory test for 'supervisor.' "); *NLRB v. Res–Care, Inc.*, 705 F.2d 1461, 1466 (7th Cir.1983) (Board has laid itself open to charges that its "supervisor" decisions have been "tinged with opportunism"); *NLRB v. St. Mary's Home, Inc.*, 690 F.2d 1062, 1067 (4th Cir.1982).

Therefore, our review necessarily becomes more probing when the Board has exhibited a pattern of applying the statute inconsistently. *See Children's Habilitation Center*, 887 F.2d at 132 (an administrative agency earns or forfeits deferential judicial review by its performance).

We find that the Board's decision on Jennings' supervisory status is not sup-ported by substantial evidence on the record as a whole. The record reveals that Jennings exercised powers under § 2(11) and that the exercise of these powers reflected independent judgment, and were of more than a clerical or routine nature.

The record reveals that Jennings was the highest ranking employee in the store during the hours of 10 p.m. to 6 a.m. Store manager Nick Collida testified that Jennings "had complete authority to manage the store in my absence." Specifically, Collida testified that Jennings was responsible for assigning work to employees on that shift, for reporting any incidents that occurred during the shift, for maintaining order in the store and handling emergencies, for policing employee and customer theft, for ensuring employee safety, and for admonishing employees who were not doing their job. Moreover, Collida testified that Jennings could initial time cards, suspend employees for company rule infractions, send employees home if business was slow, and call people from home if a worker did not show up.

Louise Collins, a checker who worked the night shift with Jennings, testified that other than the time spent stocking cigarettes, beer, and liquor, Jennings spent his time patrolling the store "making sure that everything was OK and everyone was doing their job." Specifically, Collins testified that all employees on the night shift reported to Jennings, that Jennings would reallocate labor to where the store needed it, would tell off-duty employees to leave the store, would ensure that employees were in their assigned areas, would call in additional employees if workers failed to report to work, would initial time cards, and would send excess employees home if business was slow. Collins also testified that employees considered Jennings a strict supervisor and that he kept a tight reign on the activities of baggers and stockers.

Doug Bachstein, a former Schnucks employee, testified that when he finished stocking one aisle, Jennings would direct him to another aisle assignment. Bachstein also testified that Jennings was a

strict supervisor and made sure the clerks were not goofing off on the job.

Skip Cross, the produce manager who occasionally filled in as night manager, said he exercised complete supervision over the store when he was on duty as night manager. This supervision included the power to reassign employees from department to department, discipline and monitor the floor crew and company employees, send employees home if work was slow, and contact the police in the event of theft or emergency. This testimony reveals that Jennings had the power to assign tasks and responsibly direct employees in their labors, and that Jennings exercised independent judgment in so doing.

While Jennings testified that he had no authority to discipline employees, the record reflects that he effectively recommended the termination of one employee. While working as night manager, Jennings noticed that off-duty employee Doug Bachstein appeared to have something concealed in his jacket. Jennings confronted Bachstein, who revealed he had a bag of potato chips hidden in his jacket. Jennings told Bachstein to leave the store and not to return before talking with the store manager. Jennings wrote a note on the incident to the store manager and filled out a report that managers use to report all apprehensions. Jennings identified himself on the report as the manager on duty. Bachstein never worked at the store again. There is no evidence in the record that management conducted an independent investigation into the Bachstein incident. Bachstein testified that he was fired by Jennings.

Jennings also effectively caused the transfer of two members of the floor crew, the private janitorial service that cleaned the store at night. One evening, Jennings surprised night crew worker Harold Jackson in the men's room smoking what Jennings believed to be marijuana. Jennings ordered Jackson to leave the store immediately. Jennings also reported the incident to Tom Mitchum, the owner of the firm that provided the janitorial crew, and said he did not want Jackson to return to the Ballwin store as long as Jennings was night manager. Jennings never checked with Schnucks management before taking any action regarding Harold Jackson. Mitchum removed Jackson from the Ballwin store on Jennings' direction and did not consult further with Schnucks management. After Jennings reported the incident to store manager Nick Collida, Collida conducted no further investigation. Collida testified: "I respected Tom's judgment. He was the manager on duty and he had the authority to make that decision." After Jennings complained to Mitchum about the performance of night crew worker Sharon Woolridge, Mitchum assigned Woolridge to another store because "I felt like Tom no longer had confidence in her to perform her duties." Mitchum did not discuss the transfer of Woolridge with Schnucks management.

These three instances all support the conclusion that Jennings effectively terminated one employee and had two night crew workers transferred to other stores. Section 2(11) provides that supervisory status must be found if an employee has the power effectively to recommend the discharge or transfer of an employee. *See Res–Care, Inc.,* 705 F.2d at 1467 (even where any employee can recommend discharge, supervisory status is normally found only when an employee has the responsibility for recommending discharge and whose recommendation, therefore, carries special weight).

Jennings also exercised independent judgment when handling emergencies. When an anonymous caller announced a bomb threat at the store, Jennings telephoned police and evacuated the store. The fact that an employee responds to emergencies by exercising independent judgment rather than awaiting orders from supervisors is indicative of supervisory status. *Southern Indiana Gas & Elec. Co. v. NLRB,* 657 F.2d 878, 884 (7th Cir.1981); *Monongahela Power Co. v. NLRB,* 657 F.2d 608, 613 (4th Cir.1981); *Ohio Power Co. v. NLRB,* 176 F.2d 385, 388 (6th Cir.), *cert. denied,* 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949). Moreover, it matters little that emergencies may be infrequent.

The authorization to perform the split-second thinking required, rather than its frequency, is determinative. *Southern Indiana Gas & Elec. Co.*, 657 F.2d at 884.

■ The Board's conclusion that Jennings was not a supervisor, but merely a ministerial employee, essentially means that Schnucks maintains a store with a $2 million to $3 million inventory for eight hours every day with no supervisor. While the fact that a group of workers may be found to be unsupervised for a short period of time does not mandate a finding of supervisory status, *Hydro Conduit Corp.*, 254 N.L.R.B. 433 (1981), courts are offen aided by calculating the resulting mix of supervisors to non-supervisory workers. *Waverly–Cedar Falls Health Care Ctr.*, 933 F.2d at 630; *NLRB v. Ajax Tool Works, Inc.*, 713 F.2d 1307, 1312 (7th Cir. 1983); *Southern Indiana Gas & Elec. Co.*, 657 F.2d at 885; *James E. Matthews & Co. v. NLRB*, 354 F.2d 432, 435 (8th Cir.) (the fact that if foremen were not supervisors, thirty-seven employees would be unsupervised, supports conclusion that foremen were supervisors), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966). In *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076, 1080 (6th Cir. 1987), the Sixth Circuit concluded that the Board's determination that licensed practical nurses were not supervisors meant that fifteen to thirty nursing personnel were providing patient care with no on-site supervision. "This is not a reasonable conclusion for a well-run nursing home." *Id.* Nor is it a reasonable conclusion to suppose that Schnucks would operate one of its largest stores for eight hours every day with twelve to sixteen employees on staff without on-site supervision. *See NLRB v. St. Mary's Home, Inc.*, 690 F.2d 1062, 1066 (4th Cir.1982) (perhaps the most significant factor in determining supervisory status is whether the person is the highest ranking employee at the job site); *American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 896 (7th Cir.1981) (a finding that employees are the highest ranking employees at a job site may lead to a finding of supervisory status).

In addition to the major factors listed above, courts often look to secondary factors to determine supervisory status. *NLRB v. Chicago Metallic Corp.*, 794 F.2d 527, 531 (9th Cir.1986); C. Morris, 2 *The Developing Labor Law*, at 1454 (2d ed. 1983). Among these factors is whether the employee is considered by other workers or by himself as a supervisor, or whether he is held out to be a supervisor.

■ The fact that Jennings was titled a "manager" and wore a badge identifying him as such does not control a § 2(11) analysis. *International Longshoremen's Ass'n, AFL–CIO v. Davis*, 476 U.S. 380, 396, n. 13, 106 S.Ct. 1904, 1915, n. 13, 90 L.Ed.2d 389 (1986); *Phillips v. Kennedy*, 542 F.2d at 55. It is important, however, that both Bachstein and Collins testified that employees who worked on the night shift viewed Jennings as the "boss" and followed his orders. Moreover, Mitchum testified that he was told by Schnucks that the floor crew would come under the night manager's direction. Mitchum viewed Jennings as part of the management team at Schnucks and instructed his crew to obey orders given by the night manager.

Further, contrary to Jennings' testimony at the hearing, the record shows that Jennings held himself out as a supervisor. Collins testified that Jennings told her that he had caught someone stealing and the person had lost his job over it. Mitchum testified that Jennings periodically reported to Mitchum about the performance of the floor crew. Jennings occasionally rousted Mitchum's employees from the break room or directed them to do certain work.

The Board argues that both the company and the union viewed Jennings' work as non-supervisory because he spent thirty percent of his time stocking cigarettes, beer, and liquor. The fact that Jennings spent a portion of his time on manual labor is not controlling. *Colorflo Decorator Prods., Inc.*, 228 N.L.R.B. 408 (1977), *enforced without opinion*, 582 F.2d 1289 (9th Cir.1978); *Luke's Supermarket, Inc.*, 228 N.L.R.B. 763 (1977). In *American Diversified Foods, Inc.*, 640 F.2d at 895, shift managers at a fast food restaurant were

found to be supervisors even though they spent forty to sixty percent of their time as regular counter employees. Further, while the collective bargaining agreement forbids supervisors from performing bargaining unit work including stocking, the agreement cannot supersede the statutory definition, and the agreement's provisions do not control a § 2(11) analysis. *Gerbes Super Market, Inc.*, 213 N.L.R.B. 803 (1974); *Pattern Makers' Ass'n of Los Angeles and Vicinity*, 199 N.L.R.B. 96 (1972).

For the foregoing reasons, we find that the Board's determination that Jennings was not a supervisor under the Act is unsupported by substantial evidence on the record as a whole. Since Jennings was unprotected by the Act as a night manager, Schnucks did not violate the Act by demoting him for union activity.

### B. Sunday Manager

 The agency contends Schnucks violated § 8(a)(1) of the Act after Jennings' demotion by refusing to assign him as Sunday manager on duty as a result of Jennings' union activity. At the February 22, 1990, grievance hearing, Tedoni told Jennings he could no longer work as Sunday manager because he was no longer part of management. Earlier, Vicki Vogt and Rick Russell, two non-managerial workers, were assigned Sunday manager duty.

The ALJ found Schnucks' argument that it assigned only managerial personnel to Sunday duty pretextual. The ALJ's finding misstates Schnucks' argument. Schnucks argues its policy was to assign only managers or management trainees to Sunday manager duty. The record supports their argument. The only purported non-managerial persons assigned Sunday duty during the relevant times were Vogt and Russell. Uncontested evidence in the record shows that at the time of her assignment as Sunday manager, Vogt was being trained as a front-end manager. At the time Russell was assigned to the post, he

was being trained for a grocery manager position. Since we find there is not substantial evidence on the record as a whole to support a finding that Jennings was denied Sunday manager duty because of his union activity, we reverse.[8]

### III.

At the time Schnucks demoted Jennings from night manager to produce clerk, Jennings was a statutory supervisor under § 2(11) of the Act. The Board, therefore, lacked jurisdiction to adjudicate his claim that he was demoted for engaging in protected union activity. The record is devoid of evidence that Schnucks failed to assign Jennings as Sunday manager on duty because he engaged in protected activity. The decision of the Labor Board, therefore, is reversed.

---

8. Since we find Schnucks had valid reasons for denying Jennings assignment to Sunday manager on duty, we need not address Schnucks' argument that the Board's decision that the Sunday manager position must be assigned on the basis

of seniority was not based on substantial evidence. We vacate as moot and without comment on the merits that portion of the Board's order.