**PONY EXPRESS COURIER, CORP., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**PONY EXPRESS COURIER, CORP., Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Petitioner.**

Nos. 92–1292, 92–1579.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1992.

Decided Dec. 10, 1992.

Robert L. Thompson, Atlanta, GA, argued (David M. Vaughan, on the brief), for petitioner.

William M. Bernstein, N.L.R.B., Washington, DC, argued, for respondent.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Pony Express Courier Corp. (Company) petitions this court for review of a final order[1] of the National Labor Relations Board (Board) issued on January 21, 1992. The Board granted the General Counsel's motion for summary judgment and found that the Company refused to bargain in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (a)(5) (1988). In support of its petition, the Company argues the Board erred in finding (1) the Company's drivers (courier-guards) were not "guards," as that term is defined in section 9(b)(3) of the Act, 29 U.S.C. § 159(b)(3), and (2) the Company's dispatchers were not "supervisors" as defined in section 2(11) of the Act, 29 U.S.C. § 152(11). The Board requests enforcement of its order pursuant to section 10(e) of the Act, 29 U.S.C. § 160(e). For the reasons discussed below, we deny the Company's petition for review and grant the Board's petition to enforce the order of the Board.

## BACKGROUND

### The Courier-Guards

The Company operates a national courier business. One branch of this business is located in New Brighton, Minnesota, and is responsible for operations in Minnesota, Wisconsin, and portions of North and South Dakota. The Company transports a variety of items for banks and businesses, including food stamps, payroll and bank checks in the process of collection, bank records, repair parts, computer parts, work tapes, interoffice correspondence, medical supplies and specimens, drugs, baby powder, Dr. Scholl's products, and eyeglasses. The Company transports neither cash nor jewelry.

The New Brighton branch operates under the supervision of a Branch Manager and an Operations Supervisor, both of which fall within the statutory definition of supervisor contained in the Act. There are three groups of courier-guards operating under the supervision of the New Brighton facility, numerically divided as follows: 40 to 45 who drive routes in the outlying areas, 25 who begin and end their routes at the facility, and a few who transport items between the drivers in the outlying areas and the facility. Generally, each courier-guard drives alone and utilizes a route sheet which lists the names and addresses of the customers along with the appropriate door to use to gain entry. Although courier-guards are required to wear the company uniform, they are not armed.

The courier-guards operate a variety of vehicles; half are employee-owned and are leased to the Company. The storage compartment of many of these employee-owned vehicles cannot be locked. The Company supplies the remainder of the vehicles, consisting of the following: vans, which can be locked, 16' straight trucks and line haul vehicles, some of which do not have locks. Although the company handbook instructs the employees to properly lock their vehicles, testimony indicated that this practice is

1. 306 N.L.R.B. No. 22 (Jan. 21, 1992).

not followed at all times during pickup and delivery. There was additional testimony that some courier-guards have left the engines on their vehicles running during pickup and delivery. Finally, checks and documents collected from the Company's bank customers are placed in plastic bags or other containers, some of which are not locked.

Courier-guards make deliveries to customers during business hours, although half of all pickups are collected after business hours. Approximately 10–20% of the Company's bank customers provide the courier-guards with keys or card keys for access to the premises. Pickups at these facilities are apparently made from lock boxes. Additionally, IBM, one of the Company's regular customers, provides the small number of courier-guards who handle its items exclusively with computer access codes for entry into its facilities. Items for pickup at IBM are left in foyers or hallways inside the building.

The training received by the courier-guards typically consists of two components: riding with another driver or dispatcher along the route to which they will be assigned and being instructed to read the company handbook. Although the Company has a policy of conducting criminal background investigations of its new employees, there is some question whether this has been done in practice.

Training in security matters is limited to that gained from a discussion on security aspects with the Branch Manager and that gained from the company handbook, which instructs courier-guards to protect the property of both the Company and the customers. According to the company handbook, the methods of accomplishing this include the proper use of locks and keys, maintaining alertness and generally following all security procedures. The company handbook places responsibility for the customer's building on the courier-guards if entry is made during "non-working hours." Once the courier-guards gain entry into customers' buildings, their only function is to pick up and deliver packages. If the courier-guards find a particular building unlocked when it should have been locked, the company handbook instructs the courier-guards to call the police rather than enter the location. Finally, the company handbook prohibits the use of physical force "unless absolutely necessary to protect your life or the life of another."

*The Dispatchers*

Two dispatchers work out of the New Brighton facility, one operating on the first shift from 6 a.m. until 2 p.m., and the other operating on the second shift from 2 p.m. until 10 p.m. A "lead-courier" apparently performs the functions of dispatchers during the third shift from 10 p.m. until 6. a.m. At the beginning of each shift, the dispatcher on duty is responsible for issuing timecards, keys and gasoline credit cards to courier-guards and making sure the courier-guards inspect their vehicles. The dispatchers may also assist in unloading and sorting incoming items and loading outgoing vehicles.

While the courier-guards are on their routes, the dispatchers work in the office, mainly dealing with customers and courier-guards by telephone and tracking items which are missing or undelivered. At the end of the shift, the dispatchers receive delivery documents from the courier-guards and check their accuracy. The dispatchers also ensure that the courier-guards punch out and leave the facility after completing their routes. Additionally, dispatchers sometimes serve as replacements for absent courier-guards.

Aside from a temporary exception, the dispatchers have no authority to hire or terminate employees. In late 1990, dispatcher Donovan Belford was instructed by former Operations Supervisor Sheila Starkey to hire employees because the Company was shorthanded. As a result, approximately ten employees were hired during a two-month period. The dispatchers generally act as a conduit between management and the courier-guards; they report requests for time off to either the Operations Supervisor or Branch Manager who makes the ultimate decision. The management representative then may request that this decision be conveyed to the courier-guard

by the dispatcher. The dispatchers may make recommendations for the transfer of a courier-guard from one route to another for the purposes of cross-training.

The dispatchers likewise have little authority in disciplining courier-guards. On three occasions Belford was involved in the disciplinary process; however, in two of those instances he made no recommendation of discipline, and in the third he simply advised the Branch Manager that there was a problem which needed to be addressed. The record reveals that dispatcher Richard Vallis was involved in four incidents of discipline, all of which consist of his signature appearing as a "supervisor" on written disciplinary notices. The Branch Manager made the final decision on the appropriate discipline in all of these instances. As with the decisions on time-off requests, the dispatcher may inform the courier-guards of the disciplinary decision made by the Branch Manager. Finally, it appears that dispatchers made "recommendations" for permanent employee status for probationary employees, to the extent that silence by the dispatcher regarding the employee would be considered a positive "recommendation."

*Procedural*

On May 1, 1991, Teamsters Local 120 of the International Brotherhood of Teamsters, Chauffeurs, Warehouseman & Helpers of America, AFL–CIO (the Union), filed a petition with the Board for certification as the collective bargaining representative of a bargaining unit consisting of both the dispatchers and courier-guards at the facility. During a hearing before the Board on May 14, 1991, the Company contended that its courier-guards were statutory guards within section 9(b)(3) of the Act, which would exclude them from representation in a bargaining unit consisting of employees other than guards. The Company also contended that the dispatchers were statutory supervisors as defined in section 2(11) of the Act, which would remove them from the protection of the Act. On June 7, 1991, the Board's Regional Director issued his decision finding the bargaining unit appropriate and directing an election.

On June 20, 1991, the Company filed a request for review of the Regional Director's decision which was denied by the Board on July 15, 1991, because it raised no substantial issues warranting review. A secret ballot election was held in the certified unit. The Union was elected as collective bargaining representative and was certified on July 26, 1991. The Company thereafter refused to bargain and an unfair labor practice charge was filed by the Union on October 16, 1991, alleging a violation of sections 8(a)(1) and 8(a)(5) of the Act. The General Counsel subsequently filed a motion for summary judgment, which was followed by a transfer of the proceeding to the Board and an issuance of a notice to show cause why the motion should not be granted. The Company filed a response admitting its refusal to bargain and asserting the invalidity of the certification due to its contention that the courier-guards were statutory guards within the meaning of section 9(b)(3) of the Act.

On January 21, 1992, the Board granted the General Counsel's motion for summary judgment, finding a violation of sections 8(a)(1) and 8(a)(5) of the Act and ordering the Company to bargain with the Union. It is this order that the Company petitions this court to review; the General Counsel seeks enforcement of the order.

STANDARD OF REVIEW

The Company has refused to bargain with the Union in order to obtain judicial review of the certification decision which was made by the Board. This is the accepted method of obtaining such review, as a certification granted pursuant to section 9(c) of the Act is not a final order subject to review by this court. *See, e.g., AFL v. NLRB,* 308 U.S. 401, 404–07, 60 S.Ct. 300, 301–03, 84 L.Ed. 347 (1940); *Waverly–Cedar Falls Health Care Ctr., Inc. v. NLRB,* 933 F.2d 626, 628 (8th Cir.1991) (*Waverly* ). An order to bargain, however, granted by the Board in an unfair labor proceeding, is a final order which can be appealed under the Act. *See* 29 U.S.C. § 160(e), (f). The Company may raise the alleged erroneous certification decision made by the Board as an affirmative

defense to the unfair labor practice charges. *Technicolor Gov't Servs., Inc. v. NLRB,* 739 F.2d 323, 326 (8th Cir.1984).

 The Board has broad discretion in certifying an appropriate bargaining unit because of its expertise in this area. *Allied Chemical & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 171, 92 S.Ct. 383, 393, 30 L.Ed.2d 341 (1971); *NLRB v. Chem Fab Corp.,* 691 F.2d 1252, 1256 (8th Cir.1982) (*Chem Fab*). Its factual findings regarding both guard and supervisory status under the Act will be upheld if supported by substantial evidence on the record considered as a whole and unless the findings are arbitrary and capricious. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490–91, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951); *Waverly,* 933 F.2d at 629; *NLRB v. Target Stores, Inc.,* 547 F.2d 421, 423 (8th Cir.1977). We hold that the Board's findings that the Company's courier-guards are not guards within section 9(b)(3) of the Act and that the Company's dispatchers are not supervisors within section 2(11) of the Act are supported by substantial evidence when viewed on the record as a whole.

## DISCUSSION

### *The Courier–Guards*

 Section 9(b)(3) of the Act, 29 U.S.C. § 159(b)(3), prohibits the Board from certifying a bargaining representative for a unit of guards if the bargaining unit also contains nonguard employees. That section provides that the Board shall not:

> decide that any unit is appropriate for [collective bargaining] if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

As this court has previously emphasized, the Board's determination of guard status under section 9(b)(3) has not always been uniform. *See McDonnell Aircraft Co. v. NLRB,* 827 F.2d 324, 326 (8th Cir.1987). However, the "common theme" of interpretation throughout the history of this section has been the original legislative policy of avoiding divided loyalty of those employees entrusted with the authority to enforce plant rules and protect property. *Id.* at 326–27. The requirement that the employee have a duty to protect property is not limited to company property, but rather has been extended by the Board to cover property of customers of armored car carriers. *See Brink's, Inc.,* 226 N.L.R.B. 1182 (1976).

The Board's latest pronouncement on the status of "courier-guards" appears in the case of *Purolator Courier Corp.,* 300 N.L.R.B. 812 (1990) (*Purolator II*). The Board, in *Purolator II,* affirmed the standard, previously set forth in another decision involving the same employer, *Purolator Courier Corp.,* 266 N.L.R.B. 384 (1983) (*Purolator I*), requiring that in order to qualify for guard status under section 9(b)(3) of the Act, the employee must be "engaged directly and substantially in the protection of customer property." 300 N.L.R.B. at 814. In determining that the employees in *Purolator II* were not statutory guards under this standard, the Board relied on several factors: the minimal security training and instruction received, the lack of authorization to use weapons or force in protection of property, the small percentage of deliveries where keys are required to gain access to customers' premises, the employees' minimal accountability to the employer for the property involved, and the fact that the employer held itself out to the public as a delivery service. *Id.* at 815.

In applying this standard to the present case, the Board concluded that the Company's courier-guards were not statutory guards within the ambit of section 9(b)(3) of the Act. The Company contends that the basic function of its courier-guards does involve, substantially and directly, the

protection of customer property. It contends that the findings of the Board are not supported by substantial evidence because (1) the security training received by courier-guards is not minimal, (2) customer property is not transported in unsecured containers and the vehicles used for transportation are not sometimes left unlocked and unattended, and (3) its courier-guards follow security procedures specifically designed to safeguard customer property and premises. We will address the first and third arguments together.

In the present case, the Board found, and substantial evidence in the record supports, that the security aspects of the courier-guards' duties are common-sense measures and do not require the level of protection to customer property that would afford them true guard status under the Act. The security training received by courier-guards is limited to the company handbook instructions and what little direction is given by the Branch Manager in employee interviews. The security measures delineated in the company handbook include the proper use of locks and keys, but there is evidence that some vehicles were not locked during delivery, either by choice or impossibility. Other measures advocated by the company handbook are limited to such behavior as "maintaining alertness, proper wearing of the uniform, a sharp personal appearance, proper operation of alarm systems, and following all security procedures covered in ... training."

It is true that the courier-guards make pickups and deliveries during non-working hours and thus have some responsibility for the premises of the customer. They are prohibited from allowing strangers to enter the building with them after hours and, according to the company handbook, may be required to deactivate alarms and secure the building upon their exit. Even so, the record supports the Board's finding that, once on the premises, their primary duty is to pick up or deliver packages. According to the company handbook, if a courier-guard finds the doors unlocked when they should not be, he or she is instructed not to enter but to call the police. The company handbook generally prohibits the use of force to protect the property of the customer. These cautionary procedures are, in our opinion, common-sense measures which could be characteristic of any driver employed by a pickup and delivery service.

Contrary to the assertion by the Company, testimony found in the record reveals that items from some bank customers, including the Federal Reserve, are left in unlocked containers for pickup. Finally, we cannot ignore a Company memorandum, contained in the record, which was sent to branch managers and instructed them to insist that employees use the term "courier-guards" in referring to drivers in order to help preserve their guard status under the Act. Merely bestowing a particular label upon the drivers neither expands their function nor magically transforms them into statutory guards under the Act, because we look to duties, not job titles. *International Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 396 n. 13, 106 S.Ct. 1904, 1915 n. 13, 90 L.Ed.2d 389 (1986); *NLRB v. Chicago Metallic Corp.,* 794 F.2d 527, 531 (9th Cir.1986). Under these facts, we must uphold the Board's decision that the courier-guards were not engaged directly and substantially in the protection of customer property and were thus not statutory guards within section 9(b)(3) of the Act.

The Company also argues that the *Purolator II* standard is a departure from past decisions of the Board and is inconsistent with the purpose and policy of section 9(b)(3) of the Act. Our review of such a standard for purposes of this argument is whether it has a rational basis and is consistent with the purposes of the Act. *NLRB v. Curtin Matheson Scientific, Inc.,* 494 U.S. 775, 786–87, 110 S.Ct. 1542, 1549–50, 108 L.Ed.2d 801 (1990). The Board, as any agency charged with the administration of a statute, has the power to change its construction of the statute if such change is consistent with the legislative purpose and is reasonable. *See id.; NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 265–66, 95 S.Ct. 959, 967–68, 43 L.Ed.2d 171 (1975). *See also American Fed'n of*

*Gov't Employees, Local 3884 v. FLRA*, 930 F.2d 1315, 1324 n. 12 (8th Cir.1991) ("[W]e agree that ordinarily we would defer to an agency's construction of a statute it is charged with administering, even when that construction represents a departure from past practice, so long as the agency's construction is reasonable."). Even assuming for purposes of analysis that a departure from past practice exists, the Board's construction of the Act as set forth in *Purolator II*, mandating a case-by-case approach utilizing a variety of factors in determining the status of a guard under the Act, is certainly reasonable, if not preferred.

Therefore, having addressed the validity of the *Purolator II* standard, we hold that the Board's factual finding that the courier-guards in the present case were not statutory guards under the Act is supported by substantial evidence viewed on the record as a whole.

### The Dispatchers

■ Under the Act, employers are not required to bargain with unions who represent supervisors. 29 U.S.C. § 164(a). This is because supervisors are not entitled to protection due to their exclusion from the definition of the term "employee." *Id.* § 152(3). Section 2(11) of the Act, 29 U.S.C. § 152(11), defines the term "supervisor" for purposes of our analysis, as follows:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

Thus, under the statutory definition, an individual must have the authority to exercise only one of the enumerated functions, because this requirement is read in the disjunctive. *Schnuck Mkts., Inc. v. NLRB*, 961 F.2d 700, 703 (8th Cir.1992); *Chem*

*Fab*, 691 F.2d at 1256; *NLRB v. Harmon Indus., Inc.*, 565 F.2d 1047, 1049 (8th Cir. 1977). The limitation is that such exercise must demand the use of independent judgment and not simply be of a routine nature. *Schnuck*, 961 F.2d at 703.

As with the finding of non-guard status, the finding of non-supervisory status of the dispatchers by the Board is a factual one and will be upheld if there is substantial evidence in the record to support it. The Company contends that the Board's determination is not supported by substantial evidence because the Board gave little weight to the fact that one dispatcher was given the responsibility for hiring approximately ten employees in late 1990. The Company claims the dispatchers have authority to grant and recommend time off for other employees as well as to recommend disciplinary actions on some occasions. Finally, the Company cites the salaried status of the dispatchers and the disproportionate ratio of supervisors to employees which would result from the Board decision as significant evidence of the supervisory function of the dispatchers.

The Board found that the dispatchers generally have no hiring authority and that the special authority given to Belford in late 1990 to hire employees was due to exceptional circumstances and was limited in duration. Indeed, the record shows that no hiring decisions have been made by the dispatchers since that time. The position of the Board, that a temporary grant of power to hire employees, as a result of special circumstances of need, is not sufficient to bestow supervisory status on the dispatchers, is a reasonable interpretation of the statutory language.

The Board also concluded that the dispatchers simply exercised a reporting function on matters of discipline and time off. The Board examined several individual incidents of dispatcher conduct, some involving Vallis and others involving Belford. There were four instances involving Vallis where the evidence cited by the Company consists of three written disciplinary warnings and one written suspension with his signature. The testimony of both Belford and Fleming

indicate that three incidents involving Belford consisted of Belford's reporting the incident to Fleming, who, in those cases, decided on the discipline and instructed Belford to communicate the result to the employee or instructed Belford to follow company policy. Upon our review of the record, we agree with the Board that the function of the dispatchers with respect to disciplinary action was merely to report potential infractions to management and to communicate the ultimate disciplinary decisions made by management to the courier-guards. Similarly, testimony of Belford supports the Board's finding that he had no authority to grant requests for time off, but merely reported the requests to the Operations Supervisor or Branch Manager who bore the ultimate responsibility for granting such requests.

The Company also contends that the Board failed to give substantial weight to the pay differential between dispatchers and courier-guards. We find this factor unpersuasive, as it does not result in the granting of authority to exercise independent judgment, a prerequisite for finding supervisory status under the Act. *See Monotech v. NLRB*, 876 F.2d 514, 517–518 (5th Cir.1989) (upholding finding of supervisory status where greater hourly pay was only one of a variety of considerations, including such factors as the authority to recommend wage increases for employees and the authority to discipline).

Finally, the Company argues the Board failed to give adequate consideration to both the disproportionate supervisor-employee ratio which would result if the dispatchers were found not to be supervisors and the fact that dispatchers are the highest ranking employees on duty during some shifts. Although supervisor-employee ratio is important in some situations, it cannot be determinative where the putative supervisors lack the authority to exercise independent judgment. *Waverly*, 933 F.2d at 630. For the same reason, neither can the rank of an employee be determinative, although we are not convinced that the dispatchers actually occupy a higher "rank." *See NLRB v. KDFW–TV, Inc.*, 790 F.2d 1273, 1279 (5th Cir.1986) (rejecting

argument that directors, producers, associate producers and assignment editors at TV station are supervisors because of high-ranking status); *NLRB v. Res–Care, Inc.*, 705 F.2d 1461, 1467 (7th Cir.1983) ("Although on the evening (3 p.m. to 11 p.m.) and night (11 p.m. to 7 a.m.) shifts the licensed practical nurses are the highest-ranking employees on the premises, this does not ipso facto make them supervisors."). Considering the fact that the dispatchers do not exercise independent judgment in areas of operation of the Company's business, e.g., hiring, disciplining, etc., neither the supervisor-employee ratio nor the fact of being a higher ranking employee can elevate the dispatchers to supervisory status.

For the reasons cited above, we hold that the Board's factual determination that the dispatchers are not supervisors under the Act is supported by substantial evidence viewed on the record as a whole.

Accordingly, we deny the Company's petition for review and grant the Board's petition to enforce the order of the Board.