# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1684

_____

| | | |
|---|---|---|
| Multimedia KSDK, Inc., | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | |
| | * | |
| National Labor Relations Board, | * | Petitions for Review from the National |
| | * | Labor Relations Board |
| Respondent, | * | |
| | * | |
| International Brotherhood of Electrical | * | |
| Workers, Local Union No. 4, AFL-CIO, | * | |
| | * | |
| Intervenor on Appeal. | * | |

_____

No. 00-1919

_____

| | | |
|---|---|---|
| Multimedia KSDK, Inc., | * | |
| | * | |
| Respondent, | * | |
| | * | |
| v. | * | |
| | * | |
| National Labor Relations Board, | * | |
| | * | |
| Petitioner. | * | |

_____

Submitted: January 8, 2001
Filed:   November 15, 2001

_____

Before WOLLMAN, Chief Judge, BYE, Circuit Judge, and JONES,[1] District Judge.

_____

BYE, Circuit Judge.

Television station KSDK-TV[2] seeks review of a final order of the National Labor Relations Board concluding that it violated 29 U.S.C. §§ 158(a)(1) & (a)(5) by refusing to bargain with the International Brotherhood of Electrical Workers, Local No. 4 (IBEW), as the collective bargaining agent for KSDK-TV's assignment editors and producers.  The Board found that the assignment editors and producers who work at the station are entitled to the protection of the National Labor Relations Act because they are "employees," and not "supervisors."  KSDK-TV petitions for review of that final order; the Board cross-petitions to enforce its order, and Local No. 4 intervenes in support of the order.  We deny KSDK-TV's petition for review and enforce the order.

I

KSDK-TV, Channel 5, broadcasts to a seventy-five mile radius around St. Louis, Missouri.  The station dominates the St. Louis airwaves—more denizens of St. Louis tune into Channel 5 for their news, weather and sports than any other station

---

[1]The Honorable John B. Jones, Senior United States District Judge for the District of South Dakota, sitting by designation.

[2]KSDK-TV is owned by Multimedia KSDK, Inc., a South Carolina corporation.

-2-

in the city.[3]  In recent years, KSDK-TV's St. Louis station has had the highest ratings share of any NBC affiliate in the United States.

To get its popular broadcasts on the air each day, KSDK-TV employs approximately 206 full-time employees at its St. Louis station.  Some of KSDK-TV's employees have organized into various unions under the IBEW.  The record shows that KSDK-TV has collective bargaining agreements with its broadcasting engineers, directors, production assistants, and promotion writers.  This case involves KSDK-TV's challenge to a prospective union in its News Department.

In 1997, a group of 16 producers, 4 assignment editors, and 2 tape coordinators in the News Department held an election to decide whether to form a union.  Before the ballots could be counted, KSDK-TV filed a petition with the Board challenging the eligibility of the prospective union members.  KSDK-TV argued that the assignment editors and producers were "supervisors," who are exempt from the protections of the Act.  The case went to the Board's Regional Director, who promptly sealed the ballots and held hearings on the issue.

The record shows that the producers and assignment editors work within the 97-employee News Department.  The Department is staffed by a News Director, an Assistant News Director, two Executive Producers, a Director of News Operations, producers, and assignment editors.  The staff also includes the on-air news anchors, meteorologists, sports reporters, news reporters, editors, writers, production assistants, tape coordinators, directors, and interns. The News Department broadcasts 18 newscasts each week.

---

[3]St. Louisians' legendary appetite for sports and sports news alone could fuel high ratings.  See, e.g., The Best Sports City 2000, The Sporting News, Aug. 14, 2001 (declaring St. Louis the best sports city in the United States).

The producers coordinate the newscasts. This process begins with daily meetings with the Assistant News Director, the Executive Producers, assignment editors, and sometimes a reporter. Over coffee, this group hashes out possible stories. The producer ultimately decides which stories to air. Thus, ultimately, it is the producers who decide how much coverage to devote to American Airlines' buyout of St. Louis-based TWA, the St. Louis Rams' Super Bowl victory, Mark McGwire's record-setting home runs, or any other story.

Once the stories are selected, the producer creates a "rundown" for each newscast. In the rundown, the producer chooses the order and length of each story, what format will be used, whether on-screen graphics or videos will be used, and which anchors and reporters will cover each story. While the producers hand out assignments and have some say over the other news employees' work, the producers do not actually investigate stories, shoot scenes, or create graphics. Instead they rely heavily on the independent, professional experience of the Department staff.

The four assignment editors manage the news desk. During their rotating shifts, they monitor the wire services, police scanners, press releases and outside tips for potential news stories. From this melange of sources, they post news assignments— "slugs" in newspeak—on a board. They then assign photographers and editors to cover each of the stories in the field, or to stay in the station and edit footage. The assignment editors adjust staff assignments, work schedules, and lunch breaks to meet the demands of news coverage.

The producers and assignment editors cannot hire or fire employees, although they can authorize overtime. They cannot discipline employees either, but rather must approach station management, which conducts independent disciplinary reviews. The producers and assignment editors are paid less than the anchors, reporters, and photographers.

After considering this evidence, the Regional Director found that assignment editors and producers are not supervisors. The Director then unsealed and counted the ballots. A majority had voted for the union. Accordingly, the Board certified the IBEW as the collective bargaining unit for its members.

KSDK-TV refused to recognize the union, and the IBEW responded by filing a complaint alleging unfair labor practices. The case went to the Board. The Board agreed with the Regional Director's findings that the assignment editors and producers are not supervisors and ordered the station to recognize the union. KSDK-TV then filed this petition for review.

II

Congress proscribed "supervisors" from unionizing in the Labor Management Relations Act of 1947, 29 U.S.C. §§ 141-187, believing that supervisors would be conflicted between their obligations to employers and the goals of their labor unions. Hence the Act excludes from the definition of "employee" any person "employed as a supervisor." 29 U.S.C. § 152(3). As non-employees under the statute, supervisors cannot claim the protections of the Act. Beverly Enters. v. NLRB, 148 F.3d 1042, 1045 (8th Cir. 1998) (citing Waverly-Cedar Falls Health Care Ctr., Inc. v. NLRB, 933 F.2d 626, 629 (8th Cir. 1991)).

The Act defines a "supervisor" as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). In effect, the Act establishes a three-part test for determining supervisory status.

Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer."

NLRB v. Kentucky River Cmty. Care, Inc., 121 S. Ct. 1861, 1867 (2001) (quoting NLRB v. Health Care & Ret. Corp. of Am., 511 U.S. 571, 573-574 (1994)).

The parties to this appeal agree that the assignment editors and producers acted in the interests of KSDK-TV (step 3), and so our review focuses exclusively on the initial two steps of the test.

As to the first part of this test, it bears repeating that § 152(11)'s list of supervisory functions must be read in the disjunctive. Beverly Enters., 148 F.3d at 1045. To clear up any confusion—and litigants often confuse this point—an employee need only have the authority to exercise *one* of the many enumerated job actions. So, for example, employees are "supervisors" if they can *either* assign *or* responsibly direct *or* hire.

The second element of the test questions whether the extent of an employee's authority requires him to employ independent judgment in a manner that is neither routine nor clerical. Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 703 (8th Cir. 1992). After all, "so-called 'straw bosses' are not necessarily supervisors even if they give minor orders or supervise the work of others." Beverly Enters., 148 F.3d at 1045 (quoting Schnuck, supra).

These questions are deeply fact-intensive, and they fall within the Board's domain of special expertise as an administrative agency. Schnuck, 961 F.2d at 703 (quotation omitted). We particularly acknowledge the Board's skill and experience in analyzing the "infinite gradations" of workplace authority within a given industry.

Id. Accordingly, we defer to the Board's findings on supervisory status, and we will uphold those findings if they are "supported by substantial evidence on the record considered as a whole." Pony Express Courier, Corp. v. NLRB, 981 F.2d 358, 362 (8th Cir. 1992) (citation omitted).

KSDK-TV contends that the Board actually engages in infinite manipulations of the term "supervisor." KSDK's frustration is shared by many. See, e.g., NLRB v. Winnebago Television Corp., 75 F.3d 1208, 1214 (7th Cir. 1996) (noting the Board's manipulation of the definition in § 152(11)). We have expressed similar concerns about the Board's inconsistent decision-making, Beverly Enters., 148 F.3d at 1045-46 & n.2, but we have declined requests to review Board decisions under a presumption that the Board acted out of bias, e.g., id. at 1046. The better approach is to make a "close and thorough examination of the record" in order "to ensure that the Board's findings are supported by substantial evidence and that its decision is not arbitrary and capricious." Id. (citing Winnebago Television, 75 F.3d at 1212). Thus, our standard of review remains the same: "whether substantial evidence on the record as a whole supports the board's determinations." Id. (citing Schnuck, 961 F.2d at 703).

A

We begin with the assignment editors. The Board found that the assignment editors could "assign" and "responsibly direct" others, but not with the requisite degree of "independent judgment" required by § 152(11). We believe the Board's findings on this point are reasonably supported by the record.

KSDK-TV's assignment editors cannot hire employees; nor can they fire employees. They cannot directly discipline employees. They are hourly employees. And they earn less than the photographers they assign. In short, there is ample evidence to support the Board's findings that assignment editors are not supervisors. Cf. NLRB v. KDFW-TV, Inc., 790 F.2d 1273, 1278-79 (5th Cir. 1986) (affirming the

Board's determination that television station assignment editors lacked supervisory status).

KSDK-TV argues that its assignment editors are supervisors because they assign work to photographers and editors. But this is a weak argument. The record demonstrates that assignment editors largely react to incoming news sources during their shifts. The assignment editor on duty then dispatches photographers and editors to work on the slugs. The assignment editors manage lunch breaks, and assign photographers to the field and editing floor. Making these assignments involves a mechanical and routine process. The assignment process is no doubt important to the news process, but the process does not require real "independent judgment."

Accordingly, we reject KSDK-TV's argument that its assignment editors are supervisors.

B

The Board's determination that KSDK-TV producers are not supervisors presents a closer call; accordingly, we must closely and thoroughly examine the record "to ensure that the Board's findings are supported by substantial evidence . . . ." Beverly Enters., 148 F.3d at 1046. In the final analysis, we do not believe that KSDK-TV has shown that the Board's decision lacked the support of substantial evidence.

The parties focus their arguments on the role of producers in the news production process. As described above, the producers coordinate the creation of news shows for their scheduled segments. Some producers are assigned to produce only a portion of the news show. The producers' schedules are determined by upper management and posted in the newsroom with those of the other newsroom employees. Producers may not generally reschedule their work assignments, nor may

they change the work assignments or schedules of other employees. KSDK-TV also sets the general parameters of its news shows. There will almost always be a sports segment, for example. KSDK-TV news shows are broadcast on a regular schedule, and the length of most news shows is predetermined.

KSDK-TV contends that its producers' decision-making authority constitutes the exercise of non-routine "independent judgment." The station notes that the producers determine the general format of the selected stories, their length, and their sequence in the rundown. The producers instruct the reporters and photographers on what general video or graphics they would prefer for the respective stories. Further, producers assign writers, reporters, and anchors to write scripts for the stories; producers then review the scripts for length or accuracy. The producers also control the order of the rundown and designate which anchor will read a given story. KSDK-TV concedes that other participants have input at the daily meetings, but the station argues that producers make the final content decisions. The story choices are then developed and implemented by the professional news staff within the department. KSDK-TV argues that its producers ultimately decide what events to cover in a news show.

While the Board acknowledged these facts, it considered additional circumstances which cast a different light on the news production process. Producers do not cover stories, participate in camera shoots, or schedule the crews with whom they work on any particular day. They cannot hire news personnel, and may not directly evaluate or discipline the other professionals in the news team. Producers' complaints about other workers must be processed through upper management at KSDK-TV. It is particularly telling that many of the other news professionals earn more than the producers.

The Board concluded that KSDK-TV producers act within a collaborative process. The Board found that the producers are only one part of a sophisticated

team, and that the professional staffers carry out their substantive work in a highly independent manner. The Board noted that the producers are enmeshed in an integrated team of news professionals through whose joint efforts they create a final television product. According to the Board, an individual producer facilitates the overall news-production process, and his assignment of work duties requires little independent judgment.

The Board relied on two of its prior decisions involving television news producers, McGraw-Hill Broad. Co., 163 LRRM 1108 (1999), and King Broad. Co., 162 LRRM 1269 (1999), each of which held that producers are not supervisors. In McGraw Hill, the Board held that

> similarly situated individuals in the broadcast industry were not [§ 152(11)] supervisors where they were part of an integrated production team in which their skills and responsibilities were joined in a collaborative effort with those of other news department employees in order to coordinate and develop a single product.

163 LRRM at 1110 (citation omitted).

KSDK-TV portrays McGraw-Hill and King as sharp breaks from precedent. We disagree. Both Board decisions rely upon earlier NLRB decisions, e.g., Westinghouse Broad. Co., 88 LRRM 1012 (1974); Post-Newsweek Stations, 83 LRRM 1081 (1973), and a Fifth Circuit decision, KDFW-TV, 790 F.2d at 1278, to buttress their collaboration conclusion.

We believe that, in these circumstances, the Board reasonably concluded that employees engaged in a largely collaborative enterprise do not exercise "independent judgment" of the type envisaged in the Act. To the extent that producers coordinate the news-gathering and news-covering processes, they occupy the head chair at a round table, to borrow a metaphor from Arthurian mythology. The Board's

-10-

collaboration theory finds factual support in the record in this case. And that theory has been independently adopted by the Fifth Circuit, KDFW-TV, Inc., 790 F.2d at 1278, in a decision we have cited favorably, Pony Express, 981 F.2d at 365. Thus we believe that the Board's finding that KSDK-TV producers are not supervisors under the Act is supported by substantial evidence.

We need not be detained by the fact that a discrete portion of the reasoning supporting the McGraw-Hill and King decisions rests on shaky ground following the Supreme Court's decision in Kentucky River announced during the last Term.

In McGraw-Hill, for example, the Board reasoned that "[a]lthough the producers exercise discretion or judgment in . . . communicating necessary directions to the various reporters, photographers, and technicians working with them, such discretion or judgment relates to their own responsibilities and *is based on their experience and expertise*. Thus, their authority to give directions to the employees working with them is not supervisory authority." 163 LRRM at 1111 (emphasis added). The Board's conclusion may conflict with Kentucky River, which rejected the Board's contention that employees do not use independent judgment when they rely on their professional or technical expertise to direct less-skilled employees in accordance with employer-specified standards. See 121 S. Ct. at 1867-71.

McGraw-Hill's conclusion that producers are not supervisors does not rest entirely upon the "professional expertise" argument. The Board separately enunciated the collaboration theory as an independent basis for denying producers supervisory status. There is no question that Kentucky River leaves the collaboration theory unscathed. Because the Board in the present case relied on the collaboration theory expounded in McGraw-Hill, and that theory is an alternative basis for the result in that decision, we may accept the pertinent portion of McGraw-Hill's analysis without deciding whether all of its parts can be reconciled with Kentucky River.

-11-

III

The Board "has engaged in neither unsupported fact-finding nor arbitrary decision-making," and we must therefore uphold its determination "in a close case of this nature." Beverly Enter., 148 F.3d at 1047 (quoting Waverly-Cedar Falls, 933 F.2d at 631 (Loken, J., concurring)). While we might not have made the same decision as the Board, we may not reverse the Board's decisions on that basis. Consequently, the Board's determination that the assignment editors and producers at KSDK-TV's News Department are not supervisors is upheld.

WOLLMAN, Chief Judge, concurring and dissenting.

Although I agree with the court that the Board's finding that the assignment editors are not supervisors is supported by the record, I disagree with its holding that the Board also correctly found that the producers were not supervisors.

As the court notes, the producers determine the general format, length, and sequence of the selected stories. They instruct the reporters and photographers regarding the video and graphics they would prefer for the respective stories; they assign writers, reporters, and anchors to write scripts for the stories, which they then review for length and accuracy; and they control the order of the story rundown and designate which anchor will read a given story.

To offset the compelling force of the foregoing factors, the Board looks to that which the producers do not do, such as covering stories, participating in camera shoots, or scheduling the crews with whom they work. These are essential tasks, no doubt, but they can probably not unfairly be characterized as the heavy lifting part of

the news-gathering process. The Board also points to the fact that the producers cannot hire news personnel and may not directly evaluate or discipline the other professionals in the news team. A short answer to this litany of non-duties is to repeat that a supervisor need exercise only one of the supervisory functions enumerated in 29 U.S.C. § 152(11). As for the observation that many of the other news professionals earn more than the producers, one need only observe that many professional athletes are paid at a rate greatly exceeding that of the coaches of their respective teams, yet no doubt arises as to who is the supervisor in that situation.

As for the collaborative-effort basis of the Board's analysis, it rests upon the assumption that there can be only one supervisor rather than several, an assumption that finds no warrant in the law. I have long since forgotten exactly how business was conducted at the Round Table, but I am not convinced that the Board would have found that none of the knights had supervisory authority over the vassal-attendants.

But enough of jurisprudence by metaphor. The basic flaw in the Board's decision is that it rests upon the now-rejected test employed by the Board in Providence Hospital. As the Regional Director noted in his decision,

> [I]n Providence Hospital, 320 NLRB 717 (1996), the Board noted that there is a difference between the exercise of judgment necessary to design a product, in that case a plan of patient care, and the assignment and direction of employees in producing the product. While the former may require substantial "professional" judgment, the latter may be quite routine in nature. "Independent judgment must be exercised in connection with the Section 2(11) function if the actor is to be deemed a statutory supervisor; use of judgment in related areas of a professional

or technical employee's own work does not meet the statute's language."
<u>Id.</u> at 728.

Jt. App. at 14.

As did the Regional Director, the Board looks to <u>Providence Hospital</u> for support of its decision. <u>See</u> Respondent's brief at 32.

I say now-rejected test, because I find it to be in conflict with the Supreme Court's decision in <u>NLRB v. Kentucky River Cmty. Care, Inc.</u>, 121 S. Ct. 1861 (2001).

Because the Board's collaboration analysis is an insufficient basis upon which to rest its findings regarding the producers, and because the <u>Providence Hospital</u> test can no longer carry the day, I would not enforce that portion of the Board's decision. Accordingly, while I concur in the court's holding with respect to the assignment editors, I respectfully dissent from its holding regarding the producers.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.