# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1450
_____

National Labor Relations Board

*Petitioner*

Eastern Missouri Laborers' District Council

*Intervenor*

v.

Missouri Red Quarries, Inc.

*Respondent*

_____

No. 16-1682
_____

Missouri Red Quarries, Inc.

*Petitioner*

v.

National Labor Relations Board

*Respondent*

Eastern Missouri Laborers' District Council

*Intervenor*

_____

National Labor Relations Board
_____

Submitted: September 20, 2016
Filed: April 6, 2017
_____

Before RILEY, Chief Judge,[1] MURPHY and SMITH, Circuit Judges.
_____

RILEY, Chief Judge.

The National Labor Relations Board ruled Missouri Red Quarries, Inc. (Missouri Red) committed an unfair labor practice under the National Labor Relations Act (NLRA), see 29 U.S.C. § 158(a)(1), (5), by refusing to recognize and collectively bargain with the Eastern Missouri Laborers' District Council (the union). The key issue before us is not about the unfair labor practice itself, but rather whether the Board was correct to certify the union in the first place. The Board certified the union only after it upheld a challenge to Steve Johnston's potentially determinative ballot by declaring him a statutory supervisor and thus not entitled to vote. Missouri Red contends this was error and petitions for review of the Board's decision. The Board cross-petitions for enforcement of its order, and the union intervened in support of the order. We deny the petition for review and grant the cross-petition for enforcement.

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

## I. BACKGROUND

Missouri Red operates a granite quarry in Ironton, Missouri. The quarry is staffed by ten individuals who excise granite from the quarry pits, called the "ledge," cut the granite to the desired specifications in the saw plant, and ship it to a facility in Georgia where it is manufactured for sale. The company is owned by Tom Oglesby, who also owns and oversees four other operations in Georgia and Oklahoma that employ about 140 individuals in all. Oglesby's principal office is in Elberton, Georgia, 621 miles from Ironton. As a result, his visits to the Ironton quarry are limited to a day-long visit every month or sometimes more. Oglesby stays informed by talking with Johnston—the subject of the instant petitions—for about ten minutes every week. Despite Oglesby's other business ventures, the distance, and his limited physical presence, Oglesby testified he manages Missouri Red "totally" and is "in charge of everything."

There was a clear on-site supervisor at the Ironton quarry until June 2013, when his employment at Missouri Red ended. Rather than hire a replacement, Oglesby implemented a decentralized system at Ironton with four foremen and no named supervisors.[2] Johnston was elevated to one of these foreman positions and took on certain administrative responsibilities in addition to his duties in the saw plant. Johnston estimated about 90% of his time is spent performing typical bargaining-unit work and the other 10% is spent completing administrative tasks. Though Oglesby claimed he vested each foreman with identical (non-supervisory) authority, employees viewed Johnston as the head person, having been told by Oglesby to take any problems to Johnston, and one Missouri Red employee testified "[Johnston] was the guy in charge and everybody knew it."

---

[2]Oglesby testified he still has a supervisor at each of his other quarries, yet manages the Georgia granite-processing plant and its 100-plus employees himself.

Crucial to this appeal is the role Johnston played in Missouri Red hiring two new employees. The first employee is Josh Moses, who was hired at some point in 2014. Johnston had gone to school with Moses's parents, knew he was young and in need of a job, and "figured he'd be a hard worker" because Moses had grown up on a farm. Johnston also knew Missouri Red had fired an employee from the ledge several weeks earlier, and he did not believe anyone had yet applied to fill the opening. Sensing a match, Johnston called Oglesby and told him about Moses. Oglesby told Johnston to "have him come in, do his drug test, and if he passes," hire him. Moses came in the next day, filled out an application for the first time, passed his drug test, spoke with Johnston briefly, and went to work. Shane Horn was hired in a similar fashion. In August 2014, another employee told Johnston that Horn was interested in a job. Johnston, who had "known Shane since he was a kid," called Oglesby to relay his co-worker's comment and inquire about hiring Horn. Oglesby said to "have him come in, get his drug test, and if he passes, send him to work." Johnston did just that, and Horn was hired.[3]

In April 2015 the union filed a petition with the Board seeking to represent all quarry employees not excluded under the NLRA, 29 U.S.C. §§ 151, et seq. An election was held shortly thereafter and the votes were tallied: five votes for union representation and four votes against. Johnston's ballot remained sealed because the union argued he was a statutory supervisor under § 152(11) of the NLRA and therefore not entitled to vote. Because Johnston's vote was potentially determinative—as a five-five even split would result in the union not being certified, see id. § 159(a)—the Regional Director ordered a hearing be held. The parties presented their evidence and arguments to the Hearing Officer, who concluded Johnston was not a supervisor and thus recommended his vote be counted. The union

---

[3]Missouri Red hired a third employee around this time, though Oglesby handled that hiring process himself. One employee advised against hiring this candidate.

filed exceptions and each party submitted briefs to the Regional Director. The Regional Director accepted the Hearing Officer's credibility determinations, but declared Johnston a supervisor given his effective authority to recommend hire[4] and various secondary indicia.

Having upheld the union's challenge to Johnston's ballot, the Regional Director certified the union. Missouri Red sought review by the Board, which summarily denied the request.[5] In order to seek review of the certification, Missouri Red declined to recognize the union and refused to bargain with it. The union filed an unfair-labor-practice charge with the Board, alleging violations under § 158(a)(1) and (5) of the NLRA. Missouri Red admitted its refusal to bargain, but reiterated its position that the underlying certification was improper. The Board granted summary judgment to the union because "[a]ll representation issues raised by [Missouri Red] were or could have been litigated in the prior representation proceeding." The Board ordered Missouri Red to cease and desist, and "bargain on request with the Union." Missouri Red has not done so, and petitions this court for review of the Board's order and underlying decision to certify the union. The Board cross-petitions for enforcement of its order. See id. § 160(f) (appellate jurisdiction).

## II.    DISCUSSION

The NLRA affords employees certain rights—including the right to organize and vote on representation—that do not extend to supervisors, thus whether Johnston's vote should be counted depends on whether he is a supervisor. See id. §§ 152(3), 157, 159. The statutory definition of "supervisor" has three components. See id. § 152(11); Multimedia KSDK, Inc. v. NLRB, 303 F.3d 896, 899 (8th Cir.

---

[4]The Regional Director rejected the union's other exceptions and those issues are not before us now.

[5]We treat the Regional Director's decision as final given that the Board affirmed the reasoning and findings set forth there.

2002) (en banc). First, the individual must have the authority to accomplish or effectively to recommend one or more of the twelve supervisory actions listed in § 152(11), which includes hiring. See Multimedia KSDK, 303 F.3d at 899. Second, "the authority must involve the use of independent judgment and be more than routine or clerical in nature." Id. Third, the authority must be held in the interest of the employer. See id. The party asserting supervisory status—here, the union—bears the burden of establishing these requirements. See NLRB v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 711 (2001).

Determining supervisory status under this three-part approach is fact-intensive and "'calls upon the [Board's] special function of applying the general provisions of the [NLRA] to the infinite gradations of authority within a particular industry.'" Securitas Critical Infrastructure Servs., Inc. v. NLRB, 817 F.3d 1074, 1078 (8th Cir. 2016) (quoting NLRB v. Chem Fab Corp., 691 F.2d 1252, 1256 (8th Cir. 1982)). We review the Board's conclusion "'under the deferential substantial evidence standard of review.'"[6] Id. (quoting NLRB v. Whitesell Corp., 638 F.3d 883, 890 (8th Cir. 2011)); see 29 U.S.C. § 160(f) ("[T]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive."). Provided there is substantial evidence, "'we may not preempt the Board's choice between two fairly conflicting views of that evidence.'" Securitas, 817 F.3d at 1078 (quoting JHP & Assocs. v. NLRB, 360 F.3d 904, 911 (8th Cir. 2004)).

Missouri Red tries to chip away at the considerable discretion we give the Board by asserting "the Board is known for inconsistent determinations in regard to

---

[6]Missouri Red contends the issue before us is a legal one that warrants de novo review. Our precedent makes clear fact-driven supervisory determinations warrant deference provided the Board recited the correct legal standard. See, e.g., Securitas, 817 F.3d at 1078-80. Missouri Red concedes the Board "cited the appropriate legal standards."

'supervisory status'" and in this case "seemingly went to great lengths, contrary to its precedent and policy of narrowly defining supervisory status, to define Johnston as a statutory supervisor." We are not wholly unreceptive to this argument, and have in fact expressed our own concern about the Board's apparent attempts to stretch the NLRA's protections. See Beverly Enters. v. NLRB, 148 F.3d 1042, 1045-46 (8th Cir. 1998); Schnuck Mkts., Inc. v. NLRB, 961 F.2d 700, 704 (8th Cir. 1992). The Board asserts such perceived pro-union bias is attributable to a "bygone era of Board decision-making." We do not necessarily agree.

As a result of this concern, "'our review necessarily becomes more probing'" and "a close and thorough examination of the record is called for to ensure that the Board's findings are supported by substantial evidence and that its decision is not arbitrary and capricious." Beverly Enters., 148 F.3d at 1046 (quoting Schnuck Mkts., 961 F.2d at 704). Yet we have rejected a plea to alter our standard of review so as to presume Board decisions are "the inevitable product of a pro-union bias," id., and the deferential substantial evidence standard remains, see Securitas, 817 F.3d at 1078.[7] Thus we will uphold the Board's order if (and only if) a close examination of the record reveals substantial evidence Johnston had authority effectively to recommend that Missouri Red hire Moses and Horn, and in so doing exercised his independent judgment.[8]

---

[7]This standard does not change when the Regional Director reverses the decision of the Hearing Officer. See Millard Processing Servs., Inc. v. NLRB, 2 F.3d 258, 262 (8th Cir. 1993). Because the Hearing Officer's factual findings are part of the record, we critically consider the evidence that led the Hearing Officer to a conclusion opposite that of the Regional Director and Board. See id.

[8]Missouri Red makes no argument as to the third requirement, and we think it clear whatever authority Johnston did possess was held in the interest of Missouri Red.

### A.    Authority to Recommend Hire

The Regional Director's conclusion that "Johnston effectively recommended both Moses and Horn for hire" relied primarily on its finding "Johnston's recommendation to hire proved determinative," given that Oglesby did not conduct "any sort of independent review." "The Board has consistently applied the principle that authority effectively to recommend generally means that the recommended action is taken *without independent investigation by superiors*." Children's Farm Home, 324 N.L.R.B. 61, 61 (1997) (emphasis added); see, e.g., Schnuck Mkts., 961 F.2d at 705; Donaldson Bros. Ready Mix, Inc., 341 N.L.R.B. 958, 962 (2004) (finding supervisory status because management's "independent evaluation of [the supervisor's] recommendations consist[ed] solely of reviewing . . . applications"); Venture Indus., Inc., 327 N.L.R.B. 918, 919-20 (1999) (finding authority effectively to recommend discipline and hiring even though management would "conduct[] a followup investigation about 30 to 40 percent of the time" and did not always follow the supervisors' recommendations); Fred Meyer Alaska, Inc., 334 N.L.R.B. 646, 647 (2001).

Missouri Red does not suggest Oglesby conducted any sort of independent investigation before instructing Johnston to hire Moses and Horn, and the evidence bears this out. Oglesby's involvement was limited to receiving calls from Johnston, requiring the candidates pass a drug test,[9] and giving final approval for them to be hired. Oglesby did not speak with either candidate, and there is no indication

---

[9]We do not consider the drug test on these facts to constitute an independent investigation—the Board regularly looks past such minor managerial involvement to find effective recommendation. See, e.g., Donaldson Bros., 341 N.L.R.B. at 962; Mountaineer Park, Inc., 343 N.L.R.B. 1473, 1474-76 (2004) (finding effective recommendation even though management "'review[ed]'" disciplinary recommendations to make sure they were "'justifiable'"). While the record is not clear, the evidence supports the reasonable inference that the drug test was a routine hiring practice.

Oglesby sought information beyond what Johnston provided or ever withheld approval for Johnston's hiring recommendations. In comparison, Johnston played a role that exceeded "the mere screening of applications or other ministerial participation." J.C. Penney Corp., 347 N.L.R.B. 127, 129 (2006). Johnston initiated the hiring process by suggesting Moses and Horn—neither of whom had even applied—to Oglesby. While perhaps not a formal "interview," he spoke to both candidates before they were hired. Horn went to Johnston when he first arrived at Missouri Red because "[t]hat's who [he] heard to talk to." It was Johnston who made sure Moses and Horn completed their paperwork and drug tests before sending them to work. There is evidence to suggest Johnston's co-workers were aware of his unique role in hiring. According to one employee, "[i]f we had an opening in the company and you had somebody in mind that you thought would be a good person, you'd go tell Steve Johnston." This testimony supports the Regional Director's inference that the employee who initially told Johnston about Horn's interest in a job "did not feel empowered to make a word-of-mouth recommendation directly to Oglesby" and instead told Johnston.

Missouri Red contends this evidence is insufficient when compared to other Board decisions, and that Johnston's comments to Oglesby about Moses and Horn are more akin to personal references than recommendations evidencing any sort of supervisory authority. On the surface, the Board's decision in Jefferson Chemical Co., 237 N.L.R.B. 1099, 1102 (1978), could be read to support this contention. In that case, management sometimes asked a welding inspector to recruit a new employee given his "wide acquaintance among welders in the locality as a result of his many years in the trade and the fact that he ha[d] served as a welding instructor." Id. In such instances the welder would "vouch[] for their character and qualifications," and the recruits were thereafter hired. Id. In finding such participation did not confer supervisory status, the Board held: "The fact that a recommendation for the employment of an applicant is approved out of respect for

the judgment of another, rather than because of his delegated authority to participate in the hiring process, is . . . not an indicium of supervisory authority." Id.

The Board has not required the delegation of such authority to be explicit, however. In Your Public Radio Corp. Employer, 200 L.R.R.M. (BNA) 1055, 2014 WL 3613193, at *3-9 (July 7, 2014), the Board found supervisors possessed delegated authority effectively to recommend hire where they handled virtually every aspect of the hiring process. Depending on the situation, the supervisors screened applicants or took it upon themselves to recruit co-workers they thought would be a good fit for the job; they met with applicants; and they made recommendations to management, who "relied exclusively on their recommendations when making job offers." Id. at *9. Management would then meet with candidates, "discuss[] salary and mak[e] job offers." Id. Presumably management rubber stamped the supervisors' recommendations out of a respect for their judgment, but the Board's analysis focused entirely on comparing the supervisors' proactive and extensive role in hiring to management's passive and marginal role.[10] See id. at *8-9.

We are not persuaded by Missouri Red's argument that Jefferson Chemical and the other, even less-analogous, cases it cites control our decision here. Rather we find substantial evidence Oglesby did not conduct any sort of independent investigation of Moses or Horn, and instead played a passive role in the hiring process as compared to Johnston's active and meaningful role. This is enough to constitute an effective recommendation under § 152(11), and cases like Donaldson Bros., Venture Industries, and Your Public Radio Employer support this conclusion.

---

[10]Whenever a manager or an owner approves a hire without any independent investigation—which may be a requirement for effective recommendation—it is a rubber stamp based in large part on respect for the supervisor's judgment.

-10-

Our focus then turns to whether Johnston's involvement in the hiring process was "more than routine or clerical" and "involve[d] the use of independent judgment." Multimedia KSDK, 303 F.3d at 899. Independent judgment is often found lacking when actions are "dictated or controlled by detailed instructions" or "there is only one obvious and self-evident choice." Oakwood Healthcare, Inc., 348 N.L.R.B. 686, 693 (2006). Conversely, independent judgment exists when an individual acts largely "free of the control of others" and weighs factors relevant to the action involved. Id. In perhaps its seminal decision on what constitutes independent judgment, the Board explained: "[An individual], when exercising his/her authority to recommend a person for hire, may be called upon to assess the applicants' experience, ability, attitude, and character references, among other factors. If so, the [individual's] hiring recommendations likely involve the exercise of independent judgment." Id.; see also Fred Meyer, 335 N.L.R.B. at 649 (finding independent judgment where supervisors made recommendations "based on their own assessments of what skills are needed").

We find sufficient evidence supports the conclusion Johnston exercised independent judgment in effectively recommending Moses and Horn for hire. To begin, we reject Missouri Red's assertion that "[t]here are no qualifications for an applicant to work on the ledge of the quarry." That a job involves little more than manual labor does not mean anyone can do it or that certain traits are not required or at least desired. As the Board noted, "Johnston had an independent basis for assessing" Moses and Horn and their "readiness to work" given that he knew both candidates. Such familiarity allowed Johnston to assess their "experience, ability, attitude, and character references, among other factors," and so the Board did not act capriciously in finding he exercised independent judgment. Oakwood, 348 N.L.R.B. at 693; see Ky. River, 532 U.S. at 713 ("It falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies.").

-11-

**B.     Secondary Indicia**

Finding Johnston effectively recommended Moses and Horn for hire does not end our analysis. "'One who engages in an isolated incident of supervision is not necessarily a supervisor under the [NLRA]. If this were the criterion and the hallmark of supervision then practically all employees would be supervisors.'" Jefferson Chem., 237 N.L.R.B. at 1102 (quoting NLRB v. Sec. Guard Serv., Inc., 384 F.2d 143, 149 (5th Cir. 1967)). In cases such as this—where there is substantial evidence the individual has authority to exercise independent judgment in performing at least one supervisory function, but the question is a close one—"courts often look to secondary factors." Schnuck Mkts., 961 F.2d at 706.

A number of secondary indicia support the Board's determination that Johnston is a supervisor. Most persuasive to us are the real-world implications if Oglesby was truly Missouri Red's only supervisor. That is, if Johnston was not a supervisor, then the quarry was left without an on-site supervisor for many weeks at a time. It is not "a reasonable conclusion" to think Missouri Red would run its quarry—which is spread across 400 acres and operates around the clock—"without on-site supervision." Id.; see also Empress Casino Joliet Corp. v. NLRB, 204 F.3d 719, 722 (7th Cir. 2000) ("A business cannot operate efficiently unless the employer has a team of employees he controls to whom he can delegate the essential supervisory functions that he cannot exercise personally."); NLRB v. Beacon Light Christian Nursing Home, 825 F.2d 1076, 1080 (6th Cir. 1987). Oglesby contended he alone supervised the ten Missouri Red Ironton employees in addition to the 100-plus employees he directly supervised at his Georgia plant. We find this strains credulity. See Schnuck Mkts., 961 F.2d at 706 ("[C]ourts are often aided by calculating the resulting mix of supervisors to non-supervisory workers."); Iron Mtn. Forge Corp., 278 N.L.R.B. 255, 262 (1986) (finding a ratio of 60:1 to be "an inordinately high ratio").[11]

_____

[11]Missouri Red makes much of the Board's general policy of narrowly construing supervisor status. If Johnston were not a supervisor "then the union rather

-12-

Other secondary indicia support the Board's decision. Warranted or not, employees perceived Johnston to possess some extra degree of supervisory authority. See, e.g., Schnuck Mkts., 961 F.2d at 706; NLRB v. Chi. Metallic Corp., 794 F.2d 527, 531 (9th Cir. 1986). Johnston was one of only two employees to have keys to the quarry office. See, e.g., Donaldson Bros., 341 N.L.R.B. at 962. He also received a pay raise upon becoming a foreman so that he is now tied with one other individual for highest pay rate at Ironton. See, e.g., id. Also relevant, though not controlling, is the fact Johnston was referred to as "Quarry Supervisor" on the election voter job description list. See, e.g., Schnuck Mkts., 961 F.2d at 706.

In deferring to the Board's determination, "[w]e acknowledge that there is some evidence in the record supporting the employer's view" that Johnston was an employee, not a supervisor.[12] Pac Tell Grp., Inc. v. NLRB, 817 F.3d 85, 95 (4th Cir. 2016). "Nevertheless, we are not charged with evaluating the evidence *de novo*." Id. Instead, we probe the record to determine whether there is substantial evidence to support the Board's decision, and in this case we conclude there is. Although our independent judgment could be different than the Board's, we defer to the Board and conclude it did not act arbitrarily or capriciously by upholding the union's challenge

_____

than the company [would] control the [quarry]," and the NLRA "rejects a syndicalist (that is, worker-controlled) conception of business." Empress Casino, 204 F.3d at 722. Congress left it primarily to the Board to weigh these conflicting policy interests, hence our limited scope of review. See, e.g., Ky. River, 532 U.S. at 725 n.5 (Stevens, J., concurring in part and dissenting in part).

[12]For example, Johnston spends 90% of his time performing bargaining-unit work, while only 10% of his time is dedicated to administrative duties. This weighs in favor of employee status, but does not necessitate such a finding. See Schnuck Mkts., 961 F.2d at 706 ("The fact that [a supervisor] spent a portion of his time on manual labor is not controlling."); NLRB v. Joe B. Foods, Inc., 953 F.2d 287, 296 (7th Cir. 1992) ("The fact that [a supervisor] spent a great portion of his time in hands-on work does not undercut his supervisory status.").

to Johnston's ballot, certifying the union, and finding Missouri Red committed an unfair labor practice.[13]

## III.  CONCLUSION

For the foregoing reasons, we deny Missouri Red's petition for review and grant the Board's cross-petition for enforcement.

SMITH, Circuit Judge, dissenting.

The majority holds that an individual becomes a supervisor under the NLRA by merely recommending a family friend for hire. Because this construes supervisory authority too broadly and will unnecessarily strip individuals of their organizational rights, I respectfully dissent. Specifically, I disagree with the majority's determination that Johnston possessed delegated authority to participate in the hiring process. Further, insufficient evidence exists to support the conclusion that Johnston exercised independent judgment in effectively recommending Moses and Horn for hire.

Under the NLRA, an individual is a "supervisor" if (1) the individual "ha[s] authority . . . effectively to recommend" hiring, and (2) "the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11); *see also Multimedia KSDK*, 303 F.3d at 899 (8th Cir. 2002).

---

[13]We wish to make the limited reach of our holding clear.  Contrary to the dissent's opening assertion, the fact an individual recommends a family friend for hire does not make him or her a per se supervisor under the NLRA.  We merely acknowledge it is within the Board's discretion to reach that conclusion where: (1) the individual played an active, ongoing, and essentially determinative role in the hiring process, (2) higher management played virtually no role other than giving endorsement to the individual's recommendation, and (3) strong secondary indicia exist to support the Board's conclusion that the individual is a supervisor.

*1. Authority to Effectively Recommend Hiring*

Whether an individual has supervisory authority to recommend hiring depends upon whether the individual's hiring recommendations are in fact effective. *Your Public Radio Corp.*, 2014 WL 3613193, at *8. To determine this,

> the Board examines the amount of weight the employer affords the recommendation. Specifically, the Board has found recommendations effective when "management is prepared to implement the recommendation without an independent investigation of the relevant circumstances." In the absence of such a requirement, an employer's reliance on word-of-mouth referrals could confer supervisory status on the entire staff, since it is not uncommon for employers to expect their more experienced employees to recommend someone for hire. *Finally, an individual does not "effectively recommend hiring" unless there was "delegated authority to participate in the hiring process" and not merely an employer's respect for an individual's opinion on an applicant.*

*Id.* at *8 (emphasis added) (citations omitted) (first quoting *Chevron USA*, 309 N.L.R.B. 61, 65 (1992); then quoting *Jefferson Chem.*, 237 N.L.R.B. at 1102).

Although the inquiry focuses on the weight an employer gives a recommendation, the Board has consistently applied the rule that an individual does not effectively recommend hiring unless the individual has delegated authority to participate in the hiring process and the recommendation for hire is not approved merely out of respect for the judgment of the individual. *See Cook Inlet Tug & Barge, Inc.*, 362 N.L.R.B. No. 111, 2015 WL 4101331, at *27 (June 30, 2015); *Your Public Radio Corp.*, 2014 WL 3613193, at *8; *Jefferson Chem.*, 237 N.L.R.B. at 1102 ("The fact that a recommendation for the employment of an applicant is approved out of respect for the judgment of another, rather than because of his delegated authority to participate in the hiring process, is also not an indicium of supervisory authority.").

-15-

The majority places great weight on Oglesby not conducting any independent investigation. This fact alone, however, is insufficient to confer supervisory status upon Johnston—there must be "delegated authority to participate in the hiring process," *Your Public Radio Corp.*, 2014 WL 3613193, at *8 (quoting *Jefferson Chem.*, 237 N.L.R.B. at 1102), and the hiring recommendation must not be followed "merely [out of] an employer's respect for an individual's opinion on an applicant," *id.*

The majority points out that the Board "has not required the delegation of such authority to be explicit" and has found delegated authority when an individual "handled virtually every aspect of the hiring process." Part II.A. *supra*. The majority notes that this includes when "the supervisors screened applicants or took it upon themselves to recruit co-workers they thought would be a good fit for the job; they met with applicants; and they made recommendations to management, who 'relied exclusively on their recommendations when making job offers.'" *Id.* (quoting *Your Public Radio Corp.*, 2014 WL 3613193, at *9).

However, an individual who screens, recruits, and meets with applicants before making a recommendation to management does not necessarily have delegated authority to participate in the hiring process. *See, e.g.*, *NLRB v. Harmon Indus., Inc.*, 565 F.2d 1047, 1050 (8th Cir. 1977) ("Sufficient evidence supports the conclusion that Cox did not effectively recommend that other employees be hired, fired or disciplined. Though Cox recommended that a replacement be hired in the repair department when Sullivan left, and participated in interviews of applicants, . . . [and] gave his opinion on the best applicant . . . .").[14] In *Jefferson Chemical*, management

---

[14]*See also J.C. Penney Corp.*, 347 N.L.R.B. at 129 (rejecting supervisory authority of an individual who "simply steered applicants through the system and completed their hiring paperwork"); *The Door*, 297 N.L.R.B. 601, 601–02 (1990) (finding that an employee lacked authority to effectively recommend for hire when his role in the hiring process was limited to screening resumes, making

asked an employed welder to recruit additional welders, the welder made recommendations for the hiring of other welders by vouching for their character and qualifications, and the recommended welders were subsequently hired. 237 N.L.R.B. at 1102. Yet the Board determined that the welder's participation in the hiring process was insufficient to confer supervisory status because "[a]ny attention paid to [the welder's] opinions or recommendations was based upon deference to his expertise, not to his delegated power." *Id.* And "[t]he fact that a recommendation for the employment of an applicant is approved out of respect for the judgment of another, rather than because of his delegated authority to participate in the hiring process, is also not an indicium of supervisory authority." *Id.*

Johnston guiding Moses and Horn through their hiring paperwork and personally vouching for their character does not constitute sufficient proof that he possessed delegated authority to participate in the hiring process. Johnston is not meaningfully distinguishable from the welder in *Jefferson Chemical*. Here, Johnston's recommendations were limited to personal references—nothing more. And it is unclear how Oglesby's approval of hiring Moses and Horn amounts to anything more than approval out of respect for Johnston's judgment. Thus, I do not agree that Johnston possesses sufficient authority to effectively recommend hiring.

*2. Independent Judgment*

The presence of supervisory authority also depends upon whether the individual exercised independent judgment in making hiring recommendations. The use of independent judgment "contemplates more than the mere screening of applications or other ministerial participation in the interview and hiring process." *Your Public Radio Corp.*, 2014 WL 3613193, at *8 (quoting *J.C. Penney Corp.*, 347 N.L.R.B. at 129). The Board has explained that its independent-judgment analysis

---

recommendations regarding technical qualifications, and participating in interviews).

turns on the freedom of the individual to evaluate data, formulate an opinion, and recommend accordingly. As the Board explained in *Oakwood*:

> To ascertain the contours of "independent judgment," we turn first to the ordinary meaning of the term. "Independent" means "not subject to control by others." *Webster's Third New International Dictionary* 1148 (1981). "Judgment" means "the action of judging; the mental or intellectual process of forming an opinion or evaluation by discerning and comparing." *Webster's Third New International Dictionary* 1223 (1981). Thus, as a starting point, to exercise "independent judgment" an individual must at a minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data. . . . [T]hese requisites are necessary, but not in all instances sufficient, to constitute "independent judgment" within the meaning of the Act.

348 N.L.R.B. at 692–93 (footnote omitted). Importantly, the Board "must interpret 'independent judgment' in light of the contrasting statutory language, 'not of a merely routine or clerical nature.'" *Id.* at 693 (quoting 29 U.S.C. § 152(11)). Thus, "[i]t may happen that an individual's [effective recommendation of action] will be based on independent judgment within the dictionary definitions of those terms, but still not rise above the merely routine or clerical." *Id.* If so, the exercise of such authority is insufficient to confer supervisory status. Thus, it is important to "assess the *degree* of discretion exercised by the putative supervisor." *Id.*

The exercise of independent judgment is considered more than merely routine or clerical when an individual actively exercises some form of discretionary scrutiny in assessing an applicant. Examples of independent judgment that is more than merely routine or clerical include when employees complete evaluation forms that "provide[] for the acceptance or rejection of the [applicant]," *NLRB v. Chardon Rubber Co.*, 90 F. App'x 84, 91 (6th Cir. 2003); "make their hiring decisions and recommendations based on their own assessments of what skills are needed and whether the [applicants]

. . . have the appropriate skills or qualifications," *In re Fred Meyer Alaska, Inc.*, 334 N.L.R.B. 646, 649 (2001); and are "called upon to assess [an] applicant['s] experience, ability, attitude, and character references, among other factors," *Oakwood*, 348 N.L.R.B. at 693.

However, the exercise of independent judgment is considered merely routine or clerical when an individual does not actively evaluate an applicant or only does so in an isolated instance. Examples of independent judgment that is merely routine or clerical include when employees have only "informal 'discussions' with and [give] 'suggestions' to th[eir] superiors" about hiring and transfers, *George C. Foss Co. v. NLRB*, 752 F.2d 1407, 1411 (9th Cir. 1985); "simply steer[] applicants through the system and complete[] their hiring paperwork," *J.C. Penney Corp.*, 347 N.L.R.B. at 129; and are "dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective bargaining agreement," *Oakwood*, 348 N.L.R.B. at 693.

The majority holds that sufficient evidence supports the conclusion that Johnston exercised independent judgment in effectively recommending Moses and Horn for hire because "'Johnston had an independent basis for assessing' Moses and Horn and their 'readiness to work' given that he knew both candidates." Part II.A. *supra*. "Such familiarity allowed Johnston to assess their 'experience, ability, attitude, and character references, among other factors, and so the Board did not act capriciously in finding he exercised independent judgment." *Id.* (quoting *Oakwood*, 348 N.L.R.B. at 693).

However, having personal familiarity with an applicant's family is not the same as forming "an opinion or evaluation by discerning and comparing data." *See Oakwood*, 348 N.L.R.B. at 692–93. And the majority cites no authority for the proposition that merely knowing an applicant's family automatically qualifies as a sufficient basis upon which an individual may exercise independent judgment in

-19-

recommending for hire. Instead, it seems that this is precisely the type of recommendation that the Board avoids elevating to supervisory status. *See, e.g.*, *Jefferson Chem.*, 237 N.L.R.B. at 1102.

Further, even if recommending a family friend for hire evidences independent judgment within the dictionary definitions of those terms, it does not rise above the merely routine or clerical. *See Oakwood*, 348 N.L.R.B. at 693. In fact, it is no more than what employers expect of experienced employees—referring acquaintances to their employer for possible hire. *See Your Public Radio Corp.*, 2014 WL 3613193, at *8; *NLRB v. ADCO Elec. Inc.*, 6 F.3d 1110, 1117–18 (5th Cir. 1993); *George C. Foss Co.*, 752 F.2d at 1411.

Thus, I disagree with the majority's classification of Johnston's personal familiarity with Moses and Horn as an independent basis for assessing their employability, and I would hold that insufficient evidence exists to support the conclusion that Johnston exercised independent judgment in effectively recommending Moses and Horn for hire.

I therefore respectfully dissent.

_____