# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-3570

_____

Transdev Services, Inc.

*Petitioner*

v.

National Labor Relations Board

*Respondent*

Amalgamated Transit Union, Local 689

*Intervenor*

_____

No. 20-1057

_____

Transdev Services, Inc.

*Respondent*

v.

National Labor Relations Board

*Petitioner*

Amalgamated Transit Union, Local 689

*Intervenor*

_____

National Labor Relations Board
_____

Submitted: January 13, 2021
Filed: March 16, 2021
_____

Before COLLOTON, WOLLMAN, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Transdev Services, Inc., (Transdev) petitions for review of an order of the National Labor Relations Board (the Board). The order allowed a certain class of Transdev's workers to seek union representation when the Board determined that Transdev failed to show the workers were supervisors under Section 2(11) of the National Labor Relations Act (the Act or the NLRA), 29 U.S.C. § 152(11). The Board cross-petitions for enforcement of its related order determining that Transdev unlawfully refused to bargain with the union as the certified representative of the workers. After a careful review of the record, we deny Transdev's petition for review and grant the Board's cross-petition for enforcement of its order.

I.

Transdev (formerly Veolia Transportation Services) provides transportation services in the Washington, D.C. metropolitan area pursuant to a contract with the Washington Metropolitan Area Transit Authority (WMATA). As relevant here, Transdev employs operators who drive vans, as well as road supervisors and lead road supervisors (collectively, road supervisors) who observe operators on their routes to make sure they comply with the policies and procedures of Transdev and WMATA. The operators and road supervisors work out of two facilities: one in Hyattsville, Maryland, and one in Washington, D.C. The operators based in Hyattsville are represented by Amalgamated Transit Union Local 1764 (Local

1764), and the operators based in D.C. are represented by Amalgamated Transit Union Local 639 (Local 639).

Amalgamated Transit Union Local 689 (Local 689) petitioned for an election to represent the road supervisors. The Board's Regional Director held a hearing to determine whether the road supervisors were "supervisors" under the Act[1] and thus exempt from the Act's coverage and ineligible for union representation. Two road supervisors, Thomas Holtz and Brian Jackson, testified.[2] They explained that when road supervisors observe operators violating WMATA or Transdev policies and procedures, they "counsel" the offending operator either verbally or in writing using a road observation report (ROR). Road supervisors determine whether to memorialize a counseling in writing in a ROR; both Jackson and Holtz stated that they consider factors such as the operator's experience level and the severity of the

---

[1]The Act defines "supervisor" to be:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

[2]The record contains a written "job description" for road supervisors that was introduced at the hearing before the Regional Director. However, the record further reveals that the description was created a month before Local 689's petition was filed and was a "revised" version that differed from the version Jackson received when he first started working at Transdev. The Regional Director acknowledged that the evidence "suggest[ed] the document was prepared recently" and that many of the listed responsibilities "contain[ed] conclusory language, such as 'effectively recommends.'" Accordingly, the Regional Director gave "little weight" to the description itself and instead "rel[ied] more heavily on the testimony about the road supervisors' duties and responsibilities." Transdev did not challenge this aspect of the Regional Director's decision to the Board or to this Court.

misconduct in making this determination. They both stated they would memorialize the counseling in a ROR if they witnessed an operator repeating behavior for which the operator had previously been counseled. Holtz also testified that Transdev supplied to the road supervisors a "hot list," a list of operators who have committed the same infraction "over and over again," and ordered road supervisors to "keep an eye out" for those operators. After documenting a counseling in a ROR, the road supervisors turn over the ROR to the administrative assistant for Transdev's operations director. Holtz said he did not know what happens to a ROR after he turns it in. Jackson stated that RORs are placed in the offending operator's personnel file but admitted that he did not know what impact the RORs have on the operator's job. He also acknowledged that purely verbal counseling has no impact on an operator's job. Although Jackson and Holtz characterized both verbal and written counseling as part of a "progressive" discipline process, there was no testimony or evidence showing that a verbal or written counseling had led to future discipline for an operator.

Jackson also testified that he had recommended discipline for operators more than 25 times in the past year, stating that his recommendations are "usually" followed but may not be followed due to "other variables." He did not indicate if these recommendations were contained in RORs or made by some other means, nor did he provide any examples of discipline recommendations he had made. He also stated that discipline is handled on a case-by-case basis and is "a collective effort sometimes." Holtz testified that management may conduct further investigation when he submits a ROR, depending on the severity of the violation. Holtz said he has never recommended discipline while working for Transdev.

Jackson and Holtz also testified about their roles in investigating operator accidents. Once a road supervisor is summoned to the scene of an accident, he or she gathers as many facts as possible through witnesses, physical evidence, and the operator. Based on those facts, the road supervisor determines if the accident was preventable or nonpreventable. The road supervisor fills out a packet of information, which includes the preventability determination, and turns in the packet to the safety

department. Jackson testified that sometimes he makes preventability determinations on his own, and sometimes it is a "collective decision" with the safety department. Jackson also stated that his preventability determinations are not final and can be overruled by the safety department if, for example, management officials view dash-cam video from the operator's van and then reach a different determination. Although a preventability determination may result in discipline, Jackson stated that he does not fill out any forms for discipline, explaining that the operations manager handles that. Jackson testified regarding one specific example of an accident investigation he conducted and in which he determined that the accident was preventable. He could only vaguely recall the details of the accident but stated that his determination was "likely" based on the facts he gathered "and then also in conjunction with the safety supervisor." Similarly, Holtz testified regarding one accident investigation he conducted and in which he determined the accident was nonpreventable, but the safety department later overturned his determination.

Jackson and Holtz also testified regarding road supervisors' authority to remove operators from service. Jackson explained that if he observes certain egregious misconduct, he can pull an operator from service "with no questions asked" and send that operator back to base for retraining. However, Jackson admitted that the safety director makes the final decision whether to retrain an operator. For his part, Holtz stated that his decisions to take an operator out of service can be overruled by the dispatch supervisor. Jackson claimed that operators are not paid for the time they are removed from service. Jackson and Holtz also explained they can remove an operator from service if they have "reasonable suspicion" to believe the operator is under the influence of drugs or alcohol, for which they had received special reasonable suspicion training. They explained that making a reasonable suspicion determination requires independent judgment, in that they need to know what signs to look for and to rely on their own personal experience. After removing an operator from service based on reasonable suspicion, the road supervisor contacts the safety department and takes the operator to a testing facility. If the test comes back negative, the operator is sent back out on his or her

route. Although the operator is administratively suspended until test results return, the operator is ultimately paid for the time he or she was suspended if the test comes back negative. Holtz testified regarding one incident in which he removed an operator from service based on reasonable suspicion but did not escort the operator for testing until a manager determined there was probable cause to do so. The record is unclear as to whether this incident took place during Holtz's tenure working for Transdev or when he was working for another contractor.

Jackson and Holtz also testified about their alleged authority to reward operators. Jackson explained that road supervisors carry out safety incentive programs developed by the safety department. He discussed a recent "safety blitz," for which he was given three $25 gift cards to distribute. A different safety message was posted each day during the blitz, and Jackson was "instructed" to approach operators on a "predetermined" route and ask if they knew the safety message. If the operator recited the safety message "correctly or at least to [his] satisfaction," Jackson gave the operator the gift card. Holtz testified that he had intended to give a gift card to one operator but ultimately did not when he observed that the operator was not wearing a safety vest. Holtz said he was instructed not to give a gift card to any operator who failed to follow proper procedures, which includes wearing a safety vest.

The Regional Director issued a decision dismissing the petition on the grounds that the road supervisors are statutory supervisors and thus exempt from coverage under the NLRA. The Regional Director reasoned that road supervisors have the authority to discipline and effectively recommend discipline of operators. The Regional Director declined to reach the issue of whether road supervisors have the authority to reward operators, and he additionally found that Transdev failed to meet its burden of showing that road supervisors responsibly direct operators.

The Board granted Local 689's petition for review, stating that the petition raised a substantial issue regarding whether the road supervisors have the authority to discipline or effectively recommend discipline. On review, the Board (with one

-6-

member dissenting) reversed, finding Transdev failed to show that the road supervisors have the authority to discipline or effectively recommend discipline. The Board noted that Transdev had not sought, and the Board had not granted, review on the issues of whether road supervisors have the authority to responsibly direct or the authority to reward operators. The Board opined that even assuming those issues were properly before it, Transdev failed to meet its burden of proof. Therefore, the Board found Transdev failed to establish that the road supervisors were statutory supervisors exempt from the NLRA's coverage and remanded for an election.

Following an election, the Board certified Local 689 as the exclusive collective bargaining representative for the road supervisors. After Transdev refused to bargain, Local 689 commenced a refusal-to-bargain proceeding, and the Board issued a decision ordering Transdev to bargain with the union. Transdev filed a petition for review in this Court,[3] and the Board filed a cross-petition for enforcement. We also granted Local 689 leave to intervene in support of the Board.

II.

The NLRA provides employees certain rights, including the right to "bargain collectively through representatives of their own choosing," that do not extend to supervisors. See 29 U.S.C. §§ 152(3), 157. The Act's definition of "supervisor" has three components. See NLRB v. Mo. Red Quarries, Inc., 853 F.3d 920, 924 (8th Cir. 2017) (citations omitted). "First, the individual must have the authority to accomplish or effectively to recommend one or more of the twelve supervisory actions listed in § 152(11) . . . ." Id. at 925 (citing Multimedia KSDK, Inc. v. NLRB, 303 F.3d 896, 899 (8th Cir. 2002) (en banc)). These actions include disciplining,

---

[3]The NLRA allows both the Board and an aggrieved person to file a petition in any United States Court of Appeals where the alleged unfair labor practice occurred or where "such person resides or transacts business." See 29 U.S.C. § 160(e)-(f). The parties agree that Transdev is a nationwide corporation who "transacts business" within the Eighth Circuit.

rewarding, and responsibly directing other employees. See 29 U.S.C. § 152(11). "Second, 'the authority must involve the use of independent judgment and be more than routine or clerical in nature.' Third, the authority must be held in the interest of the employer." Mo. Red Quarries, Inc., 853 F.3d at 925 (quoting Multimedia KSDK, Inc., 303 F.3d at 899).

The party asserting supervisory status—here, Transdev—bears the burden of establishing that status by a preponderance of the evidence. See Oakwood Healthcare, Inc., 348 N.L.R.B. 686, 694 (2006); see also Mo. Red Quarries, Inc., 853 F.3d at 925 (citing NLRB v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 711 (2001)). Conclusory evidence does not satisfy that burden. See Lynwood Manor, 350 N.L.R.B. 489, 490 (2007); see also Frenchtown Acquisition Co. v. NLRB, 683 F.3d 298, 305 (6th Cir. 2012) ("General testimony asserting that employees have supervisory responsibilities is not sufficient to satisfy the burden of proof when there is no specific evidence supporting the testimony.").

"The determination whether an employee is excluded from the protections of the Act because of supervisory status is a fact-intensive question 'which calls upon the [Board's] special function of applying the general provisions of the Act to the infinite gradations of authority within a particular industry.'" Securitas Critical Infrastructure Servs., Inc. v. NLRB, 817 F.3d 1074, 1078 (8th Cir. 2016) (citation omitted). Accordingly, the Board's "factual findings are reviewed 'under the deferential substantial evidence standard of review.'" Id. (citation omitted). "Under this deferential standard, 'the Board must produce more than a mere scintilla of evidence; it must present on the record such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" considering the entire record "including the body of evidence opposed to the Board's view." Id. (citation omitted). "When conflicting evidence is presented to the Board, 'we may not preempt "the Board's choice between two fairly conflicting views" of that evidence.'" JHP & Assocs., LLC v. NLRB, 360 F.3d 904, 911 (8th Cir. 2004) (citation omitted).

In its petition for review, Transdev asserts that road supervisors are statutory supervisors because they (1) discipline and effectively recommend discipline of operators; (2) reward operators; and (3) responsibly direct operators, and that Transdev met its burden to prove supervisory status. Additionally, Transdev contends that the Board's decision was unreasonable; inconsistent with the NLRA; the product of ad-hoc decision-making reflecting a pro-union bias; and arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706 (APA).

A.

Transdev first argues that the Board's conclusion that Transdev failed to prove road supervisors have disciplinary authority was not supported by substantial evidence. Transdev complains that the Board ignored "undisputed" evidence that road supervisors discipline operators by (1) issuing verbal counseling and written RORs, both of which constitute discipline under the purportedly progressive discipline systems of both collective bargaining agreements (CBAs) applicable to operators; and (2) removing operators from service. Transdev also asserts that it presented sufficient evidence demonstrating that road supervisors effectively recommend discipline of operators by (1) filling out and submitting RORs, and (2) investigating and reporting operator accidents.

1.

We first consider whether substantial evidence supports the Board's determination that the road supervisors' issuance of counseling or warnings to operators was not part of a progressive discipline policy and thus was not discipline for purposes of the Act. "To confer [statutory supervisor] status, the exercise of disciplinary authority must lead to personnel action, without the independent investigation or review of other management personnel." Lucky Cab Co., 360 N.L.R.B. 271, 272 (2014) (citation omitted) (stating that "[r]eporting on incidents of employee misconduct is not supervisory if the reports do not always lead to discipline, and do not contain disciplinary recommendations" (alteration in

original)). "Where oral and written warnings simply bring to an employer's attention substandard performance by employees without recommendations for future discipline, the role of those delivering the warnings is nothing more than a reporting function, which is not supervisory authority." Williamette Indus., Inc., 336 N.L.R.B. 743, 744 (2001). Additionally, Transdev bears the burden of proving the existence of a progressive discipline system and the role warnings issued by putative supervisors play within it. See The Republican Co., 361 N.L.R.B. 93, 99 (2014). Progressive discipline is not established where an ostensibly progressive system is not actually applied. See, e.g., Ken-Crest Servs., 335 N.L.R.B. 777, 777-78 (2001) (finding verbal warnings were not disciplinary, notwithstanding a putative progressive discipline system, because employee could receive multiple verbal warnings without further discipline and there was "no clear connection" between verbal warnings and other disciplinary measures); The Republican Co., 361 N.L.R.B. at 99 & n.8 (finding verbal warnings were not disciplinary because there was no evidence of any "fixed relationship" between such warnings and "later, actual discipline").

Substantial evidence supports the Board's conclusions that neither CBA sets forth a progressive discipline policy and that Transdev's evidence was "too vague, limited, and conflicting to establish the role that the road supervisors' warnings" played within the purportedly progressive discipline system. See Pet'r's Addendum 6. In Local 639's CBA, the disciplinary policy is not labeled a progressive policy. The policy states that Transdev will "generally" follow a four-step process for rule violations, but it reserves the right to repeat disciplinary steps as necessary or to skip steps for a nonexhaustive list of "serious" infractions. Given these qualifications, the Board concluded Transdev failed to establish that the discipline policy was progressive. This conclusion is supported by Board precedent. See Lucky Cab Co., 360 N.L.R.B. at 273 (concluding that employer did not have progressive discipline policy because handbook stated that employer "may exercise its discretion in utilizing forms of discipline").

Regarding Local 1764, the Board opined that Transdev's evidence about road supervisors' disciplinary authority did not distinguish between operators subject to Local 639's CBA and those subject to Local 1764's CBA. So "even though Local 1764's agreement articulates a progressive policy, the record does not establish that any of the disciplinary actions in evidence were taken pursuant to that policy" as opposed to Local 639's non-progressive policy. Pet'r's Addendum 7. The Board further stated that even assuming the relevant testimony referred to actions taken pursuant to an ostensibly progressive policy, the evidence did not establish that Transdev actually applies a progressive policy or the role that road supervisors' warnings played within it: (1) Transdev produced no evidence about what happens to a written ROR after submission, including whether or to what extent management relies on RORs to make disciplinary decisions; and (2) Transdev produced no evidence of higher levels of discipline referring to prior infractions, even though road supervisors were provided with a "hot list" of operators who have committed the same infraction "over and over again." Based on this evidence, the Board reasonably concluded that Transdev failed to meet its burden of proving the existence of a progressive discipline system.

Moreover, the Board reasonably concluded that Transdev failed to show RORs are anything more than reports that make no recommendation for discipline and do not automatically lead to discipline. See Lucky Cab Co., 360 N.L.R.B. at 272. The record supports the Board's observation that RORs do not contain discipline recommendations. Additionally, although Jackson testified that written RORs are placed in operators' personnel files, Transdev cites no authority for the proposition that merely placing a report in an employee's personnel file, without more, constitutes discipline. Jackson admitted that he did not know whether written RORs were even considered during an operator's evaluation. Finally, Jackson's testimony that discipline can be a "collective effort," as well as Holtz's testimony that management investigates RORs, supports the Board's conclusion that Transdev failed to demonstrate road supervisors have the authority to discipline within the meaning of the NLRA.

Transdev asserts that the Board imposed an improper evidentiary burden by requiring Transdev to provide examples of counseling that led to later forms of discipline. It claims that this requirement conflicts with precedent, which requires the employer to show only that the putative supervisors have the authority to discipline, not that they actually exercise it. See Multimedia KSDK, Inc., 303 F.3d at 899. We agree with the Board that Transdev misconstrues the evidentiary burden placed upon it. Such examples informed whether the purportedly progressive discipline system was in fact progressive, see, e.g., Ken-Crest Servs., 335 N.L.R.B. at 777-78, and went to the ultimate issue of whether Transdev met its burden of showing the existence of disciplinary authority. Thus, we view the Board's "reference to the lack of examples as a general comment on the overall quality of [Transdev's] evidence" and not as imposing a specific requirement on Transdev to provide examples. See Securitas Critical Infrastructure Servs., Inc., 817 F.3d at 1079. Accordingly, the Board did not improperly require proof that road supervisors actually exercise the authority to discipline. Finally, although Jackson and Holtz testified that their warnings were steps in a progressive discipline system, the Board reasonably discounted this conclusory testimony. See, e.g., Avante at Wilson, Inc., 348 N.L.R.B. 1056, 1057 (2006) (concluding that employer failed to meet its burden of establishing supervisory authority in part because testimony was "utterly lacking in specificity"). To the extent there was conflicting evidence on this issue, "we may not preempt 'the Board's choice between two fairly conflicting views' of that evidence." See JHP & Assocs., LLC, 360 F.3d at 911 (citation omitted).

Transdev next asserts that the road supervisors have disciplinary authority because they can remove operators from service. The Board did not err in rejecting Transdev's argument for three reasons. First, neither CBA defines removal from service as discipline. Second, at least some of the decisions to remove operators from service were followed by independent investigation. Jackson and Holtz both testified that if they remove an operator based on reasonable suspicion that the operator is impaired, that operator is removed and then sent for testing. If the testing revealed the operator was not impaired, the operator was sent back out on their route. Additionally, Holtz described an incident which he removed an operator from

-12-

service based on reasonable suspicion but did not escort the operator for testing until a manager determined there was probable cause to do so. In that sense, the road supervisors' removal decisions are not final and can be overruled. Finally, substantial evidence supports the Board's conclusion that Transdev did not show operators suffer any adverse consequences based on their removals. Although Jackson testified that operators do not get paid for the time they are removed, the Board did not credit this testimony, observing that no operators testified that their pay was docked, and no managers with the authority to dock pay testified that this happened. Additionally, for removals from service based on reasonable suspicion, the Board found that operators who ultimately test negative are paid for the time they were pulled out. Accordingly, we find that substantial evidence supports the Board's conclusion that Transdev failed to prove road supervisors have the authority to discipline operators.

2.

Transdev next argues that the road supervisors have the authority to effectively recommend discipline by (1) completing and submitting RORs and (2) investigating and reporting operator accidents. To show authority to effectively recommend discipline, putative supervisors must make actual discipline recommendations, not merely "report incidents." See Ill. Veterans Home at Anna L.P., 323 N.L.R.B. 890, 890 (1997). Additionally, "[t]he Board has consistently applied the principle that authority effectively to recommend generally means that the recommended action is taken *without independent investigation by superiors*." Mo. Red Quarries, Inc., 853 F.3d at 926 (quoting Children's Farm Home, 324 N.L.R.B. 61, 61 (1997)).

As stated above, the record supports the Board's observation that the RORs do not contain discipline recommendations and that Transdev produced no evidence about what happens to a ROR after it is submitted. And although Jackson testified that he had recommended discipline "more than 25 times," he provided no description of what those recommendations entailed, how he made them, or what

disciplinary consequences resulted. His testimony is "utterly lacking in specificity" and therefore insufficient to establish supervisory authority. See Avante at Wilson, Inc., 348 N.L.R.B. at 1057. Additionally, Holtz testified that he had never recommended discipline while working for Transdev. Finally, Jackson and Holtz testified that management was involved in deciding whether to discipline operators and has "overruled" their RORs, which supports the conclusion that any recommendations were followed by an "independent investigation by superiors" and are therefore insufficient to establish supervisor status. See Mo. Red Quarries, Inc., 853 F.3d at 926 (emphasis omitted). Thus, we find that substantial evidence supports the Board's conclusion that Transdev failed to show road supervisors have the authority to effectively recommend discipline based on the completion and submission of RORs.

Regarding the road supervisors' roles as accident investigators, the record reveals that accident investigations do not prompt road supervisors to make discipline recommendations. Moreover, Jackson and Holtz both testified that their preventability determinations are not final, and Jackson testified that sometimes the determination is a collective decision by the department, all of which suggests a lack of "independent judgment" in this area. See id. at 925. Transdev supplied only two specific examples of accident investigations: one by Holtz, whose nonpreventable determination was later overturned, and one by Jackson, who could only vaguely recall the incident and said his determination was likely based on facts he gathered "and then also in conjunction with the safety supervisor." This evidence reasonably supports the conclusion that road supervisors do not use independent judgment. Thus, we find that substantial evidence supports the Board's conclusion that Transdev failed to show road supervisors have the authority to effectively recommend discipline based on their roles as accident investigators.

Accordingly, we conclude that substantial evidence supports the Board's determination that Transdev failed to sufficiently prove road supervisors have the authority to discipline or effectively recommend discipline, and therefore Transdev failed to prove road supervisors are statutory supervisors on this basis.

-14-

B.

Transdev alternatively argues that the road supervisors have the authority to reward operators, thereby satisfying the NLRA's definition of supervisor. The Board argues to this Court that Transdev forfeited the "reward" argument by not first presenting it to the Board. On review of the Regional Director's decision, the Board, assuming the issue was properly before it, addressed the issue on the merits because Transdev "consistently argued—including in its opposition and brief on review— that the road supervisors have the authority to reward." Pet'r's Addendum 9 n.28.[4] Because Transdev argued the authority to reward in the proceedings below, we are not convinced that the argument is forfeited, and we will address it on the merits.

The Board has found authority to reward where there was "a direct correlation between evaluations [by putative supervisors] and the . . . occasional . . . bonuses awarded." See Bayou Manor Health Ctr., 311 N.L.R.B. 955, 955 (1993). Here, the Board concluded that Transdev's evidence did not show that the authority to reward was anything more than isolated, infrequent, or sporadic, or that the road supervisors exercised independent judgment in "rewarding." Upon our review of the evidence, we find that the Board reasonably concluded that the one-time distribution of gift cards under the circumstances described by Jackson and Holtz was insufficient to show that road supervisors have the authority to reward. See Franklin Hosp. Med. Ctr., 337 N.L.R.B. 826, 829 (2002) (noting that sporadic exercise of supervisory authority does not confer supervisory status); cf. Public Serv. Co. of Col. v. NLRB, 405 F.3d 1071, 1078 (10th Cir. 2005) (affirming the Board's finding that utility investigators lacked independent judgment in rewarding other employees because their decisions were guided primarily by objective criteria).

---

[4]The Board noted that it granted review of the Regional Director's decision solely on the issue of discipline, and Transdev did not seek review of the Regional Director's findings that road supervisors had exercised the authority to reward but probably not more than sporadically.

## C.

Transdev also alternatively argues that road supervisors have the authority to responsibly direct other employees. The Board again argues that Transdev forfeited this argument by not seeking review from the Board on this basis. Similar to the reward argument discussed above, the Board noted in its decision that Transdev "consistently advanced this [responsible direction] argument in each of its filings," including its opposition to the request for review. Pet'r's Addendum 5 n.12. Because the issue was argued before the Board, we will address it on the merits.

Direction is responsible if "the person directing and performing the oversight . . . [is] accountable for the performance of the task by the other." See Oakwood Healthcare, Inc., 348 N.L.R.B. at 691-92. Transdev contends that road supervisors are held accountable for improperly placing an operator back in service, but it points to no record evidence to support this contention. More importantly, Transdev's argument hinges on the road supervisor's own performance, not on him or her facing adverse consequences for the *operator's* performance as Board precedent requires. See id.; cf. STP Nuclear Operating Co. v. NLRB, 975 F.3d 507, 518-19 (5th Cir. 2020) (reversing the Board's decision and concluding that unit supervisors responsibly directed other employees based in part on evidence that unit supervisors' bonuses were impacted by the performance of their crew). In its brief to this Court, Transdev never argues or explains how road supervisors are accountable for the operators' performance. Accordingly, we find the Board's decision that Transdev failed to show road supervisors responsibly direct other employees was supported by substantial evidence.[5]

---

[5]We need not consider Transdev's argument that "secondary indicia" suggest the road supervisors have supervisory authority because the secondary indicia are relevant only upon a showing that an employee performs a supervisory function. See Mo. Red Quarries, Inc., 853 F.3d at 928 ("In cases such as this—where there is substantial evidence the individual has authority to exercise independent judgment in performing at least one supervisory function, but the question is a close one— 'courts often look to secondary factors.'" (citation omitted)).

The dissenting Board member opined that if the road supervisors were not found to be supervisors under the Act, then "615 [operators] would be supervised exclusively by four . . . or . . . 14 people," and that such a "finding fails the 'test of common sense.'" Pet'r's Addendum 14 (citation omitted). However, this position mistakenly assumes that the lay definition of "supervisor" is the same as the Act's. As the Board majority explained, this position ignores a "basic legal fact: the finding that the road supervisors are not statutory supervisors simply means that they 'may vote whether to be represented for purposes of collective bargaining, and be represented as part of a unit that selects a representative.'" Pet'r's Addendum 5 n.13 (citation omitted). Such a finding "does not mean that the road supervisors cannot monitor the performance of other employees or that they cannot report their findings to [Transdev]. Nor does it mean that they cannot issue orders to other employees, or that [Transdev] cannot discipline other employees for failure to obey such orders." Pet'r's Addendum 5 n.13.

## D.

Finally, Transdev argues that the Board's decision was unreasonable, inconsistent with the NLRA, the product of ad-hoc decision-making reflecting a pro-union bias, and arbitrary and capricious in violation of the APA. We view these arguments as merely different articulations of the argument that the Board's decision was not supported by substantial evidence. It is true that we have previously acknowledged inconsistent Board decisions regarding supervisory status. See Beverly Enters. v. NLRB, 148 F.3d 1042, 1046 (8th Cir. 1998). But despite acknowledging the inconsistencies, we have simply said that "a close and thorough examination of the record is called for to ensure that the Board's findings are supported by substantial evidence and that its decision is not arbitrary and capricious," and we continue to apply the substantial evidence standard. See id.

---

Additionally, because we find that the Board's decision was supported by substantial evidence, we need not consider the Intervenor's additional argument that Transdev failed to meet its burden of proof because the road supervisors acted in the interest of WMATA rather than Transdev.

("The standard, as we have reiterated many times, is whether substantial evidence on the record as a whole supports the [B]oard's determinations."); accord Mo. Red Quarries, Inc., 853 F.3d at 925-26.  We conclude that the Board's decision here was supported by substantial evidence, and it did not act arbitrarily or capriciously in finding that Transdev failed to show road supervisors were statutory supervisors, certifying the union, and finding that Transdev committed an unfair labor practice.

## III.

For the foregoing reasons, we deny Transdev's petition for review and grant the Board's cross-petition for enforcement.

_____